RICHARD THURSTON et al., *Appellants*, v. RICHARD GRECO et al., *Respondents*.*

*Neil J. Hoff, McCormick, Hoffman, Rees & Arnold, Holman, Williams, Manning & Poll,* and *Preston, Thorgrimson, Horowitz, Starin & Ellis,* for appellants.

*The Attorney General* and *Philip H. Austin, Assistant, Ronald L. Hendry,* and *Frederick B. Hayes,* for respondents.

*George M. Mack (Roberts, Shefelman, Lawrence, Gay & Moch* and *William G. Tonkin,* of counsel) and *G. Keith Grim* (of *Lane, Powell, Moss & Miller*), amici curiae.

WEAVER, J.—This is an action of mandamus against the Pierce County auditor and the members of the Pierce County Canvassing Board established by RCW 29.62.020.

*Reported in 474 P.2d 881.

The complaint prays for judgment directing defendants to certify that

the Tacoma School District No. 10 special levy and the County-City expansion bond issue have passed by reason of the votes cast in the election of November 4, 1969 . . .

In general, the crux of plaintiffs' contention is that certain sections of the Washington State Constitution and its implementing statutes, requiring that certain propositions presented to the electorate must have the assent of three-fifths of those voting are in violation of the equal protection clause of the federal constitution.

Plaintiffs appeal from a judgment of the trial court dismissing their action with prejudice.

We affirm.

The facts are these:

November 4, 1969, Pierce County voters were asked to consider two proposals: the Tacoma School District No. 10 special levy and the County-City Building expansion project bond issue. In the school district election, 53.4 per cent of the voters favored the levy; in the county-wide County-City Building bond election, 52.3 per cent of the voters cast ballots in favor of the measure. Thus, both propositions failed to meet the 60 per cent approval required by law.

It is contended that the 60 per cent majority requirement gives each negative voter greater voting power than an affirmative voter; that it, therefore, debases the vote of an affirmative voter and is offensive to the principle of "one man, one vote." It is, of course, contended by plaintiffs-appellants that the equal protection clause of the fourteenth amendment to the federal constitution requires that the assent of a simple majority of those voting is sufficient to approve the levy for the school district and to authorize issuance of bonds for the County-City Building expansion project.

Although the judgment from which this appeal is prosecuted determines that two Washington constitutional

provisions and four statutes[1] are not in violation of the equal-protection clause of amendment 14 of the federal constitution, it is sufficient, for the purpose of deciding the questions presented on this appeal, to discuss only one—Const. art. 7, § 2 (amendment 17)—the 40-mill tax.

Amendment 17 of our constitution provides that all taxes levied on real and personal property shall not exceed 40 mills on the dollar of the assessed valuation (port and public utility districts excluded); that the specific limitation imposed by law may be exceeded only by a taxing district when it is authorized to do so by a majority of at least three-fifths of the electors voting upon the excess levy. The number of persons voting must constitute not less than 40 per centum of the total number of votes cast in the taxing district at the last preceding general election.[2] For research purposes, the full text of amendment 17 is set forth as Appendix "A" to this opinion.

Before analyzing the judicial decisions upon which plaintiffs-appellants base their argument, we deem it helpful to an understanding of this opinion to state our stand upon two issues—independent in one sense, a part of the same overall picture in another.

■ *First:* When an American citizen qualified to exercise his right of suffrage goes to the poll, he may make use of his right of franchise in one of two capacities. He may be participating in the democratic process by which we select our representatives in our republican form of government; or he may be acting in his legislative capacity by voting for

---

[1]Const. art. 7, § 2 (amendment 17), the 40-mill limit; RCW 84.52.052—authorizing excess levies; RCW 84.52.056—excess levies for capital purposes; Const. art. 8, § 6 (amendment 27), limitation on municipal indebtedness; RCW 39.36.020—limiting municipal indebtedness; RCW 28-.51.020—bond election regulations.

[2]The total number of persons voting on each of the propositions under consideration in the instant case exceeded the requisite 40 per cent of the votes cast in the county and school district at the latest preceding general election. The validity of this electorial condition is not an issue in this case. We do not decide the issue. Nothing in this opinion is determinative or even suggestive of a solution to the problem.

or against a proposition submitted by initiative, referendum, recall, or required by the statutes and state constitution. He is taking part in the legislative-decision process of making law.

■ *Second:* Certain writers, legal commentators, and some judges, in opinions, have murmured the recently popularized phrase, "one man, one vote" and offered it as a nostrum for all political questions. From it, as an erroneous major premise, they reach the conclusion that the equal-protection clause of the Fourteenth Amendment places its mandatory blessing upon the proposition of majoritarianism; and that every issue of American government requires that its determination be made by a vote of 50 per cent of those voting, plus one. Not only is their assumed premise wrong historically, but, carried to a logical conclusion, would open a Pandora's box of governmental ills that would grind the teeth from the gears of government.

With these distinctions in mind, we turn to the recent decisions of the United States Supreme Court, starting with *Baker v. Carr,* 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962). In *Baker,* the court held that a justiciable issue was presented when it was alleged that the voting rights of individuals had been debased by the malapportionment of Tennessee legislative districts; thus, a vote in one district was worth less than a vote in another district because of geographic location.

Later cases in the United States Supreme Court presented the same problem of gross inequality of voting weight, either because of geographic malapportionment, or because of invidious distinctions in the system of electing representatives.

Illustrative are: *Gray v. Sanders,* 372 U.S. 368, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963) (involving Georgia's county-unit system of counting votes for statewide officials, United States Senators, and Congressmen); *Wesberry v. Sanders,* 376 U.S. 1, 11 L. Ed. 2d 481, 84 S. Ct. 526 (1964) (debasement of individual voting rights by malapportionment of state congressional districts); *Reynolds v. Sims,* 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964) (debasement of

individual votes resulting from malapportionment of the legislatures of Alabama and five other states); *Carrington v. Rash,* 380 U.S. 89, 13 L. Ed. 2d 675, 85 S. Ct. 775 (1965) (a state may not exclude a member of the armed forces from the voting franchise; " '[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966) (constitutionality of Virginia poll tax); *Avery v. Midland County, Texas,* 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114 (1968) (voting rights debased by malapportionment of county precincts); *Kramer v. Union Free School Dist. 15,* 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969) (New York statute, which excluded anyone not a real property owner or a parent of a child in school from a school district election, held unconstitutional); *Cipriano v. Houma,* 395 U.S. 701, 23 L. Ed. 2d 647, 89 S. Ct. 1897 (1969) (unconstitutional to exclude one not paying property tax from voting on the issue of municipal revenue bonds).

Weaving its way through these decisions, we find a thread of consistency helpful to the solution of the problems before us.

▆ In the well considered opinion of *Bogert v. Kinzer,* 93 Ida. 515, 465 P.2d 639 (1970), the court having discussed the opinions we have identified, summarized:

> Votes cast in the process of selecting representatives in government may not be debased to the end that one person's vote is worth more than another's because of geographic location. Persons may not be denied the right to vote for their representatives in government because of distinctions which are "invidious." . . .
>
> Persons may not be denied the voting right in other decision making elections when such denial results in a fencing out without a rational basis. There must be a reasonable relationship between the interest or non-interest of a group and its being granted or denied the vote. . . . Race is not a reasonable relationship upon which to base a denial; ownership of property or parent-

hood are not sufficient criteria of interests in school board elections having overtones of other decision making; ownership of property is not a sufficient criteria of interest in a revenue bond election when non-property owners will utilize and pay for the services, but property ownership is a sufficient criteria in an election to determine the issuance of general obligation bonds.

. . .

We believe and hold that nowhere in the lines of cases is there even a hint that the constitutional and statutory provisions in the case at bar, which allegedly "debase" the vote of plaintiffs-respondents, are offensive to the requirements of the Equal Protection Clause.

We subscribe to the summary of the Idaho Supreme Court.

Counsel have directed our attention to several decisions of lower courts in other jurisdictions treating with the problem involved. We need not discuss them.

Two decisions, however, involving the same issue we have before us have been decided by the highest appellate court of two states: West Virginia (*Lance v. Board of Education,* ............ W. Va. ............, 170 S.E.2d 783 (1969)), and Idaho (*Bogert v. Kinzer,* 93 Ida. 515, 465 P.2d 639 (1970)).

*Lance* holds that the West Virginia constitutional three-fifths' vote requirement necessary to validate the bonded indebtedness of political subdivisions is repugnant to the fourteenth amendment to the federal constitution.[3] *Bogert* holds to the contrary.

After a thorough analysis, we agree with the Supreme Court of Idaho:

We do not adopt, but specifically reject, the language and the reasoning of the West Virginia Court.

Amendment 17 of our constitution was adopted by the people of this state November 7, 1944, by an overwhelming majority vote. Its adoption culminated an uninterrupted series of enactments by initiative and referendum over a

---

[3]The United States Supreme Court has granted certiorari to review *Lance.*

period of more than 10 years, all of which embody the requirement of a 60 per cent affirmative vote for relief from the 40-mill limit. The ultimate purpose of this legislation and of the Seventeenth Amendment was to limit taxes against property and reallocate a portion of the burden of state taxation to other forms of taxable incidents. This is a constitutionally permissible purpose.

On at least seven occasions the voters of this state concluded that at any special election where a 60 per cent affirmative vote could be obtained, the objective of the 40-mill law to permit excess levies only on a clear showing of need by the taxing district would have been convincingly demonstrated to the voters. This policy decision prevents the wholesale circumvention of the property tax limit desired by the people.

In amendment 17 there is no classification of voters. No one is excluded from voting because of lack of some qualification. He may vote as he pleases for or against the proposition presented. If there be a classification by requiring a 60 per cent majority, it is a choice made by the voter himself in voting for or against the particular proposition; it is not the result of a discrimination established by the amendment.

We believe there is a rational basis for the 60 per cent requirement and that its purpose is directed to a constitutionally permissible end. No one is excluded from voting as he chooses; amendment 17 does not deny any person equal protection of the laws.

The forgoing opinion was prepared by Justice Weaver prior to his retirement and is adopted by the undersigned.

The judgment is affirmed.

HUNTER, C. J., FINLEY, HAMILTON, HALE, NEILL, MC-GOVERN, and STAFFORD, JJ.

#### APPENDIX A

Art. 7, § 2 FORTY MILL LIMIT. Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year

exceed forty mills on the dollar of assessed valuation, which assessed valuation shall be fifty per centum of the true and fair value of such property in money: *Provided, however,* That nothing herein shall prevent levies at the rates now provided by law by or for any port or public utility district. The term "taxing district" for the purposes of this section shall mean any political subdivision, municipal corporation, district, or other governmental agency authorized by law to levy, or have levied for it, ad valorem taxes on property, other than a port or public utility district. Such aggregate limitation or any specific limitation imposed by law in conformity therewith may be exceeded only

(a) By any taxing district when specifically authorized so to do by a majority of at least three-fifths of the electors thereof voting on the proposition to levy such additional tax submitted not more than twelve months prior to the date on which the proposed levy is to be made and not oftener than twice in such twelve month period, either at a special election or at the regular election of such taxing district, at which election the number of persons voting on the proposition shall constitute not less than forty per centum of the total number of votes cast in such taxing district at the last preceding general election;

(b) By any taxing district otherwise authorized by law to issue general obligation bonds for capital purposes, for the sole purpose of making the required payments of principal and interest on general obligation bonds issued solely for capital purposes, other than the replacement of equipment, when authorized so to do by majority of at least three-fifths of the electors thereof voting on the proposition to issue such bonds and to pay the principal and interest thereon by an annual tax levy in excess of the limitation herein provided during the term of such bonds, submitted not oftener than twice in any calendar year, at an election held in the manner provided by law for bond elections in such taxing district, at which election the total number of persons voting on the proposition shall constitute not less than forty per centum of the total number of votes cast in such taxing district at the last preceding general election: *Provided,* That any such taxing district shall have the right by vote of its governing body to refund any general obligation bonds of said district issued for capital purposes only, and to provide for the interest thereon and amortization thereof by annual levies in excess of the tax limitation provided for herein, *and Provided further,* That the provisions of this section shall also be subject to the limitations contained in Article VIII, Section 6, of this Constitution;

(c) By the state or any taxing district for the purpose of paying the principal or interest on general obligation bonds outstanding on December 6, 1934; or for the purpose of preventing the impairment of the obligation of a contract when ordered so to do by a court of last resort.

FINLEY, J. (concurring)—I have signed the majority opinion, but feel some further comment is germane and may be helpful. In essence, the instant case is an attack on the 60 per cent majority requirement of the Washington

Constitution as a violation of the equal protection provision of the Fourteenth Amendment. Fourteenth Amendment equal protection jurisprudence has generally utilized two separate standards of review.[4] One, utilizing the normal presumptions of constitutionality, requires only that the classification adopted bear a rational relationship to a legitimate public purpose.[5] The other standard of review, requiring a "very heavy burden of justification,"[6] (*i.e.*, the showing of a compelling state interest) is imposed either when a "suspect" classification such as race is utilized[7] or when the interest protected is as fundamental to the demo-

---

[4]*Kramer v. Union Free School Dist. 15*, 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969), provides one of the most recent utilizations of this "dual" standard of review. *See also Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966); *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964). The adoption of the dual test has not been without dissent. *See* Mr. Justice Harlan dissenting in *Katzenbach v. Morgan*, 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966), and in *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969). I expressed some of these reservations in my dissent to *Adams v. Hinkle*, 51 Wn.2d 763, 322 P.2d 844 (1958), when this court adopted a dual standard of review in equal protection cases. But these views have not prevailed. Both the court and commentators make it clear that the dual level test has been adopted as a method of analyzing Fourteenth Amendment problems. We cannot ignore it. *See generally* Developments in the Law—Equal Protection, 82 Harv. L. Rev. 1065 (1969); The Supreme Court, 1968 Term, 83 Harv. L. Rev. 60, 77 (1969).

[5]The term "classification" is somewhat misleading. Arguably a classification may or may not be involved in the instant case. *See* Note, Constitutionality of the voting provisions in the seventeenth amendment to the Washington Constitution, 42 Wash. L. Rev. 640 (1967); Note, Extraordinary Majority Voting Requirements, 58 Geo. L. J. 411 (1969). For examples of the use of the "rational relationship" test, *see Sailors v. Board of Educ.*, 387 U.S. 105, 18 L. Ed. 2d 650, 87 S. Ct. 1549 (1967); *State ex rel. Namer Inv. Corp. v. Williams*, 73 Wn.2d 1, 435 P.2d 975 (1968); *Lone Star Cement Corp. v. Seattle*, 71 Wn.2d 564, 429 P.2d 909 (1967). The rational relationship has been, at times, rather tenuous. *See, e.g., Goesaert v. Cleary*, 335 U.S. 464, 93 L. Ed. 163, 69 S. Ct. 198 (1948); *Kotch v. Board of River Port Pilot Comm'rs*, 330 U.S. 552, 91 L. Ed. 1093, 67 S. Ct. 910 (1947).

[6]*Loving v. Virginia*, 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967).

[7]*See, e.g., McLaughlin v. Florida*, 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964).

cratic process as voting or interstate travel.[8] In either case, all members of the class must be similarly treated.

Thus, I think the initial question to be evaluated in this case is what standard of review is to be applied to the excess levy vote. At first glance one is tempted to apply a rather simplistic syllogism—the Supreme Court has applied the more stringent standard of review to voting cases; this case is a voting case; hence the statute must be struck down unless a compelling state interest can be found. It is this syllogism which underlies much of appellant's arguments. I think some fallacies are inherent in the underlying syllogism. This prompts some elaboration on my part beyond the views expressed in the majority opinion, hopefully to ameliorate confusion or misunderstanding which I apprehend may arise in the future as to this case.

The majority does suggest one way of avoiding this dilemma, *i.e.*, characterization of this case as that of a voter acting in a legislative capacity and not in the capacity of choosing legislative or other governmental officials. Although the majority does not discuss this question, it is conceivable that this distinction might be used as a means of differentiating between what standard of review is to be applied. The United States Supreme Court has made it clear that this distinction does not automatically mean that one standard or the other is applicable. *See Cipriano v. Houma,* 395 U.S. 701, 23 L. Ed. 2d 647, 89 S. Ct. 1897 (1969) (compelling state interest test applied to municipal bond election); *Kramer v. Union Free School Dist. 15,* 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969), wherein the court held that the more stringent test of review applied regardless of whether "the questions scheduled for the election need not have been submitted to the voters." 395 U.S. at 629 n.11. Thus, on the question of what standard is to be applied, the characterization of the election as one choosing representatives or governmental officials or as a quasi-legis-

[8]*See, e.g., Harper v. Virginia Bd. of Elections, supra* note 1; *Carrington v. Rash,* 380 U.S. 89, 13 L. Ed. 2d 675, 85 S. Ct. 775 (1965); *Kramer v. Union Free School Dist. 15, supra* note 1; *Shapiro v. Thompson, supra* note 1.

lative one does not provide an easy answer to the problems with which we are confronted in the instant case.

It is also clear that the Supreme Court does not require that any case involving voting be automatically decided under the more stringent standard. This question has been decided by the Supreme Court in *McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 22 L. Ed. 2d 739, 89 S. Ct. 1404 (1969). The plaintiffs in *McDonald* were prisoners awaiting trial in Cook County, Illinois. When their application for absentee ballots was rejected, they contended that the rejection was a denial of equal protection. The court held that in the absence of a showing of outright disfranchisement, the more lenient "rational relationship" test would be applied.[9] In doing so, the court suggested that stringent review is limited to situations where the vote is diluted by malapportionment or denied by disfranchisement.[10]

There is no question but that there has been no outright disfranchisement in the instant case. No one was prevented from actually casting a ballot for any reason. If there is any interference with a fundamental right, it is in the nature of a dilution of vote akin to malapportionment. This requires a close scrutiny of the malapportionment decisions in order to determine whether their rationale is applicable. It is my conviction that the stringent scrutiny in those cases was justified by the central and unique importance of the franchise in our system of government. The legislature has the responsibility of reapportioning itself. If there is malapportionment, there is no incentive for those representatives of the minority of the electorate who have majority control of

---

[9]*McDonald* is not the first voting case to apply the "rational relationship" test. *See Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 3 L. Ed. 2d 1072, 79 S. Ct. 985 (1959); *Katzenbach v. Morgan*, 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966).

[10]The court, in *McDonald*, held that the more stringent standard did not apply because there were no distinctions drawn on the basis of wealth or race and no impairment was shown to the ability of the appellant to exercise the fundamental right to vote. The only cases cited as examples of the application of the more stringent standard involved either malapportionment or outright disfranchisement.

the legislature to cure the malapportionment. Hence the malapportionment becomes chronic. Without recourse to the courts, there is no orderly and potentially effective procedure for the majority of the electorate to cure this fatal defect which has been called "close to the core of our constitutional system." *Carrington v. Rash,* 380 U.S. 89, 13 L. Ed. 2d 675, 85 S. Ct. 775 (1965). This, however, is not the situation with which we are confronted. The majority of the electorate retains the power to change or repeal amendment 17. Prior to its adoption by a two to one majority in 1944, the electorate enacted initiatives or referendums to the same effect every 2 years from 1932 to 1942. Liberalizing amendments have been consistently defeated. Substitute House Joint Resolution 4, Laws of 1957, p. 1302; Substitute Senate Joint Resolution 1, Laws of 1961, p. 2749; Senate Joint Resolution 23, Senate Journal, Fortieth Legislature (1967) at 1957. There is no dilution of the vote here involved, either indirectly in voting for representatives or through direct participation in the legislative process. One person *has* one vote.[11]

This is not to imply that there should be no judicial scrutiny of any voting regulations adopted by the majority of the electorate. Obviously, the exclusion of any class of voters on say racial or lineage grounds would be suspect despite participation and support by any majority. Similarly, any weighted voting for representatives so that a challenging candidate is required to garner 60 per cent of the vote very apparently at this point in time would be impermissible under the Fourteenth Amendment.

But, again, such is not the situation with which we are confronted. In the instant case there is no question but that there is access to the governmental process. We are not confronted with the problem which Mr. Justice Black recently recognized in his analysis of the malapportionment

---

[11]*Cf.* Note, *Constitutionality of the voting provisions in the seventeenth amendment to the Washington Constitution,* 42 Wash. L. Rev. 640 (1967); Note, *Extraordinary Majority Voting Requirements,* 58 Geo. L. J. 411 (1969).

cases in *Hadley v. Junior College Dist.*, 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791 (1970):

> While the particular offices involved in these cases have varied, in each case a constant factor is the decision of the government to have citizens participate individually by ballot in the selection of certain people who carry out governmental functions.

Here we have no selection of governmental officials at any level. Neither is there a dilution of votes because the voter lives in a particular area or district. The suspicion of discrimination which is triggered by a denial of the vote or by malapportionment does not exist in the instant case. A rationale compelling a special scrutiny is simply not applicable. Amendment 17 must be accepted as constitutional unless no rational relationship can be found between that scheme and a legitimate governmental purpose. The majority adequately demonstrates the existence of such a relationship. This does not imply that I believe that the 60 per cent majority requirement is a particularly wise means of determining tax burdens. That, however, is not a judicial prerogative. Any change must come from the legislature and the people, where the power to make any change is, in my judgment, quite properly entrusted and vested.

NEILL, McGOVERN, and STAFFORD, JJ., concur with FINLEY, J.

ROSELLINI, J. (dissenting)—The majority opinion concludes that amendment 17 does not directly or indirectly result in the debasement or the dilution of the vote. This conclusion distorts reality, defies all logic and rewrites the law of mathematics. Where a negative vote against a proposition counts one and one-half times as great as a positive vote, it results in the dilution and debasement of the positive vote. This is constitutionally impermissible, as I shall demonstrate.

To fully understand the invidious effect of amendment 17, it will be necessary to discuss not only the provision that the tax limitations imposed by law may be exceeded only by a taxing district when it is authorized to do so by

the majority of at least three-fifths of the electors voting upon the excess levy, the so-called "60 per cent" provision, but also to discuss the provision that the number of persons voting must constitute not less than 40 per cent of the total number of votes cast in the taxing district at the last preceding general election. This 40 per cent provision was not involved in this case, as the bond issue did receive the 40 per cent. However, the whole constitutional scheme must be discussed to demonstrate that the purpose of the amendment was to debase the vote of those citizens favoring the bond issue or tax levy and to discriminate against citizens because of the way they might vote.

The inevitable result of any requirement of a majority of more than 51 per cent is to give one group of voters a greater influence on the outcome of an election than another group of comparable size but of the opposite conviction. The 60 per cent voting limitation has the effect of assigning a greater weight to negative votes than to favorable votes. Unlike the situation in which a simple majority is required and each vote is given the same weight, the 60 per cent requirement gives a negative vote a weight one and one-half times as great as that of a favorable vote. One negative vote is 50 per cent more effective in defeating a proposed bond issue or excess tax levy than a favorable vote approving it. Thus, the constitutional provision requires a popular referendum on bond issues and tax levies but *only* on the basis which tips the scales in advance very substantially against those who will vote for approval.

It is also quite obvious that this grossly unequal weighting of votes is accomplished through a classification of voters according to whether they might favor or oppose the tax or bond proposition. For purposes which I shall later describe, the constitutional and statutory provisions here at issue disable all those persons who might favor the adoption of bond or tax propositions by diluting and debasing the effectiveness of their votes and at the same time single out all those persons who might oppose those propositions and grant them special advantage by increasing the effectiveness of their votes. Departures from the rule of simple

majority within the electoral process must be recognized for what they truly are. In this case the 60 per cent voting limitation assigns grossly unequal influence to voters on bond or tax propositions simply on the basis of whether they oppose or favor the issue.

The following statement from *Gray v. Sanders,* 372 U.S. 368, 379, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963), illustrates more readily the effect of the 60 per cent limitation:

> If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote; none could successfully contend that that discrimination was allowable.

When a state weights the negative vote more heavily than an affirmative vote, discrimination results.

The 40 per cent voting limitation further dilutes and debases the vote of those favoring a tax levy or bond issue. This provision requires that the total number of persons voting an excess tax levy or bond issue must constitute no less than 40 per cent of the total number of votes cast in a taxing district at the last preceding general election. It must be kept in mind that both the 60 per cent limitation and the 40 per cent are interrelated and independent. What I have already said about the effect and purpose of the 60 per cent voting limitation applies equally to the 40 per cent limitation. Together they compound the impairing, diluting and debasing of the votes of those who favor a bond issue or an excess levy.

The Washington Attorney General stated in AGO 65-66, No. 83, April 12, 1966, at 3:

> [B]oth the forty percent requirement of the 17th Amendment and its companion three-fifths or sixty percent requirement *operate to make it more difficult for proponents of an excess levy proposition to obtain passage of the measure at the polls than it is for the opponents of the proposition to defeat it.*

(Italics mine.) Indeed, in the case of the 40 per cent voting limitation, it may operate *totally* to nullify all favorable votes on a proposition. The Attorney General stated further:

An acknowledged practical consequence of . . . the "forty per centum" requirement . . . is that an excess levy proposition may receive approval of well over the requisite three-fifths (60%) of persons voting on the proposition and yet fail to pass because of insufficient *total* voter turnout.

Thus, not only is the negative vote arbitrarily favored with added weight under the 60 per cent limitation, it also may prevail under certain conditions no matter how vast a majority might favor the proposition. Conversely, though voters who favor the proposition must always overcome the debasement of the effectiveness of their votes, they may also be *totally disenfranchised*. The potentially small margin of nonvoters representing the difference between the total vote and the 40 per cent required (it could be merely one nonvoter) has an absolute veto over those who vote "yes."

The general rule with respect to nonparticipation by voters in elections in which they might otherwise have participated is that those who do not participate are presumed to consent and agree to the will of those who do. Statutes requiring that propositions receive majority votes are construed to require only the approval of a majority of those voting on the proposition, not a majority of all those who *might* have voted. *Virginian Ry. v. System Federation No. 40,* 300 U.S. 515, 560, 81 L. Ed. 789, 57 S. Ct. 592 (1937) (union certification election); *Carroll County v. Smith,* 111 U.S. 556, 28 L. Ed. 517, 4 S. Ct. 539 (1884); *Laconia Water Co. v. Laconia,* 99 N.H. 409, 112 A.2d 58 (1955) (election on proposed municipal acquisition of waterworks); *Heuchert v. State Harness Racing Comm'n,* 403 Pa. 440, 170 A.2d 332 (1961) (election on issuance of racing license); *Dominic v. Davis,* 262 P.2d 143 (Okla. 1953) (election on school district annexation); *In re Todd,* 208 Ind. 168, 193 N.E. 865 (1935); Annot., 131 A.L.R. 1382 (1941). *See also Weybright v. Klein,* 104 Colo. 590, 592, 92 P.2d 734 (1939) (election on proposed municipal acquisition of electric plant) in which the court stated:

Government by majorities does not rest upon the fact

that majorities actually express themselves, but upon the necessary presumption that the silent electors approve what the articulate do, otherwise they would protest . . . If the affirmative vote must be a majority of *all,* negative votes are futile, [for] they are as effective uncast as cast.

Viable government cannot tolerate the exercise of political power by silent portions of the electorate, by inactive nonvoters. It is plain that government must proceed to do those things required of it, irrespective of speculation and conjecture about the unexpressed will of citizens who do not vote.

Yet, the framers and advocates of amendment 17 specified that the total of those citizens who vote must constitute a certain percentage of the number of electors at some previous election. The traditional presumption of assent by the silent was reversed and in effect changed to dissent by the silent. The burden of electoral nonparticipation was shifted entirely to the favorable voters. As a result, the 40 per cent voting limitation discriminates against favorable voters and arbitrarily benefits negative voters. Nothing in common experience or logic can justify presuming dissent by silent voters and placing that burden wholly upon favorable votes by retroactively invalidating them. Indeed, as noted above, the courts have recognized that logic and common experience require an opposite result. Citizens opposed to certain governmental action will not remain silent.

Although there is a sparse historical record concerning the 60 per cent voting limitation, one can glean the following. The limitation upon municipal indebtedness was contained in article 8, section 6, of the original Washington Constitution of 1889. This provision indicates that at least some delegates viewed the three-fifths requirement for votes upon municipal indebtedness as "a protection against the floating population." Journal of the Washington State Constitutional Convention of 1889, with Analytical Index (1962), at 679. By this it was apparently intended that the votes of certain transient groups of citizens would be discounted and disregarded in the election in order to arrive

at a vote reflecting the will of more substantial citizens. Putting aside the question of the constitutionality of such a purpose under present constitutional principles, it is clear that the means adopted for that purpose erect a classification of voters which is utterly imprecise and arbitrary. If it was ever rational to discount the votes of 10 per cent of the voters at a bond election because they are deemed to be part of the "floating population," surely today such a procedure operates unnecessarily to disable concerned citizens by diluting their votes for quality education or necessary public betterment. If such a purpose is valid at all, it is already accomplished by residence requirements applicable to the franchise. Anyone who is a qualified elector of a school district or a taxing district and who expends the effort involved in voting at a tax levy or bond election has a very serious interest in the affairs of the district. The 60 per cent voting limitation operates simply as gross favoritism for those opposed to incurring debt or levying a tax for educational or other purposes.

It has been suggested that the 60 per cent limitation, at least with respect to the incurring of indebtedness, is "for the protection of minorities, for the protection of posterity, and to protect majorities against their own improvidence." *State ex rel. Potter v. King County,* 45 Wash. 519, 528, 88 P. 935 (1907). *See also Raynor v. King County,* 2 Wn.2d 199, 208, 97 P.2d 696 (1940). However, these purposes are extremely broad and equivocal. Presumably, the minority intended to be protected is that group of persons who might oppose school district indebtedness, since the 60 per cent voting limitation makes their votes 50 per cent more effective than votes of persons favoring indebtedness; presumably, posterity is to be protected by weighting the electoral process against the creation of long-term debt; presumably, it is deemed improvident for majorities to incur such indebtedness; yet, the 60 per cent voting limitation also permits a minority of voters to frustrate the elective will of an equally concerned majority. It is clear that a minority may also condemn posterity to inadequate and deteriorating education for its children, and the deteriorating quality of

urban life and the institution of government. Such a system of weighting votes is contrary to basic principles of democratic government.

As I have already shown, the 60 per cent vote required for the passage of bond or excess property tax levy propositions erects two classes of voters: those who favor the proposition and those who oppose it. The effect of the 60 per cent vote required for approval is to disable all those voters favoring the proposition by making their votes 50 per cent less effective than the votes of those citizens opposed to the proposition. The citizen in favor of the proposition is disadvantaged to the extent that he is required to muster three votes for every two votes against the proposition. Also, the precise weight of a citizen's vote is expressly made to turn upon his political views about municipal debt, taxation and education. His vote counts for more if he opposes governmental propositions relating to those matters, substantially less if he favors them. Similarly, this weighting of votes distributes political advantage or disadvantage among various private interest groups in the state, which consist of individual voters.

The 40 per cent voting limitation applicable to excess tax levy elections may nullify all favorable votes and place great power in the hands of a third class of citizens, the nonparticipant. The negative voters are only aided by the requirement, since invalidation of the election defeats the proposition. In fact, if a citizen's preference on a tax or bond proposition is negative, his influence on the election is greater by not voting than by casting his weightier "no" vote.

It is indicated that the 60 per cent voting limitation was intended to dilute votes. This 60 per cent voting limitation appeared as the Forty Mill Law enacted by Initiative No. 64 in 1932. Earlier attempts by real estate interests to limit their tax burden were unsuccessful. *See, e.g., The Life Story of the 40-Mill Limit,* 14 Wash. Educ. J. 40, No. 2 (1934). With the advent of the great depression and the popular feeling against all taxation, its advocates were successful in getting voter approval of Initiative No. 64. The

40-mill law was then reenacted in 1934, 1936 and 1938 as Initiatives 94, 144 and 129, respectively, and as referenda in 1940 and 1942. The history of these 40-mill limit statutes is briefly traced in A. Harsch and G. Shipman, *The Constitutional Aspects of Washington's Fiscal Crisis,* 33 Wash. L. Rev. 225, 256-57 (1958); *see also* League of Women Voters of Washington, *Facts and Issues: The 40%-60% Voting Requirement* 1 (1966).

By 1939, there was a movement to write the 40-mill law into the state constitution, where it would be permanently safe from change by the legislature as it had been during the operative periods of the initiatives and referenda. In that year, Representatives Montgomery and Chervenka introduced House Joint Resolution No. 3, which would have proposed the 40-mill limit along with the 60 and 40 per cent voting limitations to the people for adoption as an amendment to the constitution. It was reported from committee but no further action was taken on it by the House. House Journal 37, 418-19 (1939). Then in 1941 Representatives Chervenka and Montgomery introduced House Joint Resolution No. 6 to the same effect. At the second reading, a motion to strike the three-fifths requirement for votes on excess levies was defeated. But at the third reading, House Joint Resolution No. 6 failed to achieve the vote necessary to place the measure before the people for adoption into the constitution. Four representatives explained their negative votes as reluctance to place such a tax limitation beyond the control of the people and their representatives in the legislature. House Journal 79, 281-82, 395 (1941). Finally, in 1943, the House adopted House Joint Resolution No. 1, which was again sponsored by Representatives Chervenka and Montgomery. In both the House and Senate, motions to replace the three-fifths vote requirement with a simple majority were defeated. House Journal, 144-49, 161-62 (1943); Senate Journal 358-63 (1943). The Seattle Post-Intelligencer of January 29, 1943, p. 6, col. 4, reported House debate prior to a close 76-22 vote. Representative Murphy stated that House Joint Resolution No. 1, as it stood, would help "only large property holders." Representative Montgomery

said the resolution would "simply let the people decide what to do with the 40-mill plan . . . They voted on it in previous elections and passed it each time." *See also* A. Harsch, *The Washington Tax System—How It Grew,* 39 Wash. L. Rev. 944, 958-60 (1965).

At the November 1944 general election, House Joint Resolution No. 1 was approved.

From the history of this measure, it appears that the limitation of 40 mills per dollar of assessed valuation placed upon property taxes in the years 1932 through the constitutional amendment of 1944 was promoted primarily by real estate interest groups. The imposition of that limitation represented a successful effort to prohibit the legislature from taxing property beyond what at that time appeared to be a desirable limit. Though promoted as a tax saving measure for all, in reality it shifted the burden of taxation from certain private interests to other classes of persons, and the stringent 60 and 40 per cent voting limitations are an integral part of that overall purpose of protecting certain economic interests. It is apparent that the intent was to impair the vote of a citizen who might favor a levy or bond issue for the purpose of a public improvement or better education.

Although the United States Supreme Court has not ruled upon the precise question we are considering, the decisions in vote denial and debasement cases lead to the result that the 60 per cent limitation in the Washington Constitution is impermissible under the equal protection clause of the Fourteenth Amendment.

The reapportionment decisions of the United States Supreme Court following *Baker v. Carr,* 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962), are significant in this case because they establish the proposition that classification which impairs, dilutes, and debases the effectiveness of votes are as invalid as classification which prohibits the franchise.

The precise holdings of the reapportionment decisions were that classification of voters residing within the same basic geographical area and standing in the same relation to

the particular legislative representatives for whom votes could be cast, violated the equal protection clause whenever those classifications gave one class of voters a more effective voice than another class simply because of where the voter happened to reside. The apportionment schemes scrutinized by the court were found most often to discriminate against the urban or suburban voters and to favor arbitrarily the rural class of voters.

In *Gray v. Sanders,* 372 U.S. 368, 379-80-81, 9 L. Ed. 2d 821, 83 S. Ct. 801 (1963), the court analyzed the complex Georgia county unit system as a basis for counting votes in the Democratic primary nomination of a United States Senator and statewide officers. The court held that this system, which in the end result weighted the rural vote more heavily than the urban vote, infringed plaintiff's right to equal protection of the laws.

How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. . . .

. . .

. . . The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.

In *Wesberry v. Sanders,* 376 U.S. 1, 7, 11 L. Ed. 2d 481, 84 S. Ct. 526 (1964), the court analyzed Georgia's statutory apportionment of Congressional representatives among its people. Though the population of its Fifth Congressional District far exceeded that of any other, each of 10 districts

was allotted only a single representative. This variance from population as the basis of representation was held to violate U.S. Const. art. 1, § 2. The court found that the apportionment statute "contracts the value of some votes and expands that of others." Since the federal constitution intended that each vote for members of Congress "be given as much weight as any other vote, . . . this statute cannot stand."

Finally, in *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964), and its companion cases, *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 12 L. Ed. 2d 568, 84 S. Ct. 1418 (1964) (New York); *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656, 12 L. Ed. 2d 595, 84 S. Ct. 1429 (1964) (Maryland); *Davis v. Mann*, 377 U.S. 678, 12 L. Ed. 2d 609, 84 S. Ct. 1441 (1964) (Virginia); *Roman v. Sincock*, 377 U.S. 695, 12 L. Ed. 2d 620, 84 S. Ct. 1449 (1964) (Delaware); and *Lucas v. Forty-Fourth Gen. Assembly of Colorado*, 377 U.S. 713, 12 L. Ed. 2d 632, 84 S. Ct. 1472 (1964) (Colorado), the Supreme Court applied the equal protection clause to the constitutional and statutory apportionment schemes of state legislatures. The holding of the court was tersely stated:

> We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

*Reynolds*, 377 U.S. at 568.

The court set forth the history of its scrupulous protection of the right of suffrage.

> It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted . . . The right to vote can neither be denied outright . . . nor destroyed by alteration of ballots . . . nor diluted by ballot-box stuffing . . . *And history has seen a continuing expansion of the scope of the right of suffrage in*

*this country. The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.*

(Footnote omitted. Italics mine.) 377 U.S. at 554-55.

The court emphasized that:

[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. *Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.* Modern and viable state government needs, and the Constitution demands, no less.

. . . Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the *concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.* . . . Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race . . . or economic status . . . Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures. And the democratic ideals of equality and majority rule, which have served this Nation so well in the past, are hardly of any less significance for the present and the future.

(Italics mine.) 377 U.S. at 565-66.

Thus, place of residency may not be used to determine the *weight* of a man's vote.

[N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes.

(Footnote omitted.) 377 U.S. at 579-80.

The court in *Carrington v. Rash,* 380 U.S. 89, 94, 13 L. Ed. 2d 675, 85 S. Ct. 775 (1965), struck at the heart of all impermissible discrimination which excludes certain groups from the franchise. When persons are denied the vote because they are of a particular race, creed or color, because they are poor, or because they do not hold certain property interests, the ultimate purpose of such exclusions is to deprive such groups of the political influence they would otherwise command and to void the expression of their political views at the polls. Race, wealth and property have been considered indicia of supposed political views. Schemes which deny the vote indirectly on those bases or directly according to "the way . . . [persons] may vote" or "a fear of the political views of a particular group" are constitutionally impermissible.

Classification of citizens according to whether or not they have certain property interests and the denial of the right to vote on that basis is also impermissible under the equal protection clause of the Fourteenth Amendment. In both *Kramer v. Union Free School Dist. 15,* 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969), dealing with school district elections, and *Cipriano v. Houma,* 395 U.S. 701, 23 L. Ed. 2d 647, 89 S. Ct. 1897 (1969), dealing with municipal revenue bond elections, the United States Supreme Court struck down state constitutional or statutory provisions which excluded from the franchise those citizens who did not own taxable real property within the appropriate municipal corporation.

The decision of *Carrington v. Rash, supra,* at 94, held that provisions of a state constitution excluding servicemen from the franchise were invalid under the equal protection clause of the Fourteenth Amendment.

The court stated:

"Fencing out" from the franchise a sector of the population *because of the way they may vote is constitutionally impermissible.* "[T]he exercise of rights so vital to the maintenance of democratic institutions," *Schneider v. State,* 308 U.S. 147, 161, cannot constitutionally be obliterated *because of a fear of the political views of a particular group of bona fide residents.*

(Italics mine.)

In the Supreme Court of Appeals of West Virginia in *Lance v. Board of Education,* ........ W. Va. ........, 170 S.E.2d 783 (1969) (U.S. Sup. Ct. appeal pending), the issues raised in *Lance* were identical to the 60 per cent limitation issues raised in this action. There the plaintiffs challenged the validity of West Virginia Const. art. 10, §§ 1 and 8, and art. 1, ch. 13, §§ 4 and 14, Code of 1931 of the State of West Virginia, as amended, which required a favorable vote of 60 per cent of the voters in order to authorize political subdivision and tax levying bodies of the state to incur bond indebtedness and to levy taxes in excess of certain limits. It was held that the 60 per cent provision violated the equal protection clause of the United States Constitution.

The Supreme Court of California, in a decision filed June 30, 1970, *Westbrook v. Mihaly,* 2 Cal. 3d 765, 471 P.2d 487, 510 (1970), held that the provision of the California Constitution which requires that general obligation bond proposals of counties, cities and school district obligations be approved by a two-thirds majority of the voters violated the equal protection clause of the fourteenth amendment to the United States Constitution.

The California court's answer to the question of majoritarianism deserves quoting, beginning at 797:

They observe that unqualified majoritarianism has not been the model for many of our institutions and that we have often afforded minorities power to preserve the status quo. They confront us with provisions of our federal and state Constitutions which sanction deviations from simple majority rule. They then admonish us that, since the two-thirds requirement cannot be distinguished from any of these provisions, a decision invalidating it will

inevitably undermine the constitutionality of all. We cannot agree.

First, there is no merit to the attempt to analogize section 18 to institutional arrangements of varied historical origin and specialized function, such as the electoral college, the allocation of two senate seats to each state regardless of population, or the unanimous jury verdict required for a criminal conviction. Efforts to justify state-imposed inequalities in voting power through reliance on analogies to other distinct institutions have met with no success in the United States Supreme Court. For example, in *Gray* v. *Sanders, supra,* 372 U.S. 368, 378, the court declared: "We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historic concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State . . . ." (Fns. omitted.) In *Reynolds* v. *Sims, supra,* 377 U.S. 533, 573, the court observed that: "Attempted reliance on the federal analogy appears often to be little more than an after-the-fact rationalization offered in defense of maladjusted state apportionment arrangements." Our reaction to analogies to, for example, the treaty ratification procedure in the United States Senate is not dissimilar.

Second, many of the extraordinary majority provisions to which we are referred are readily distinguishable in that, since they apply solely to the internal procedures of legislative bodies, they involve no dilution of the individual exercise of the franchise which is in issue here. Some, such as the two-thirds required for conviction of impeachment (U.S. Const., art. I, § 3) or expulsion from Congress (U.S. Const., art. I, § 5) are designed to avoid precipitate action in areas of particular importance or sensitivity. Others, such as the two-thirds required to override a presidential (U.S. Const., art. I, § 7) or gubernatorial (Cal. Const., art. IV, § 10(a)) veto or the two-thirds required to ratify a treaty (U.S. Const., art. II, § 2) represent those basic allocations of power between branches of government which are at the heart of that great system of "checks and balances" established by the founding fathers. In neither case is there any infringe-

ment of the individual citizen's right to vote such as that effected by section 18.

Finally, those extraordinary majority vote requirements which do apply outside the legislative process are by no means uniformly invalidated by our decision today. *We emphasize that while it has not been demonstrated that a two-thirds vote requirement for approval of local general obligation bonds is necessary to promote a compelling state interest, similar provisions in other contexts may meet this standard.*

(Footnote omitted. Italics mine.)

It is not material that the voting limitations here are based primarily upon constitutional provisions of the state of Washington as adopted at the constitutional convention of 1889 or at the general elections of November 1944 or November 1952. In *Lucas v. Forty-Fourth Gen. Assembly of Colorado,* 377 U.S. 713, 12 L. Ed. 2d 632, 84 S. Ct. 1472 (1964), the Supreme Court struck down a constitutional amendment which had been adopted by a 305,700 to 172,725 majority of the people of the state and which provided for legislative apportionment based on factors other than population. The court stated, at page 736:

An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. . . . ". . . [F]undamental rights may not be submitted to vote; they depend on the outcome of no elections."

*Accord: Reitman v. Mulkey,* 387 U.S. 369, 18 L. Ed. 2d 830, 87 S. Ct. 1627 (1967). It is, therefore, no answer to the examination of the voting limitations here that they were originally approved by popular vote and made part of the state constitution. The court must act to protect a citizen's right to cast equally weighted votes no matter what the source of the impairment of those votes.

I would hold that the provisions of Const. art. 7, § 2 (amendment 17), which provide that the tax limitations may be exceeded only by the taxing district when it is authorized by a majority of at least three-fifths of the elec-

tors voting upon the excess levy and that the number of persons voting must constitute not less than 40 per cent of the total number of votes cast in the taxing district at the last preceding general election, are invalid and violate the equal protection provisions of the United States Constitution.

I would further decree that this decision be given prospective effect only.

July 2, 1971. Petition for rehearing denied.

[No. 41586.   En Banc.   September 24, 1970.]