[No. 1879-1.    Division One.    May 20, 1974.]

JOHN F. SINGER *et al., Appellants,* v. LLOYD HARA,
*Respondent.*

*Smith, Kaplan & Withey* and *Michael E. Withey,* for
appellants.

*Christopher T. Bayley, Prosecuting Attorney,* and *Richard D. Eadie, Deputy,* for respondent.

SWANSON, C.J.—Appellants Singer and Barwick, both males, appeal from the trial court's order denying their motion to show cause by which they sought to compel King County Auditor Lloyd Hara to issue a marriage license to them. According to the parties' agreed statement of facts, appellants applied for a marriage license on September 20, 1971, and after respondent Hara refused to grant such a license, the motion to show cause was filed on April 27, 1972. In an order dated August 9, 1972, the trial court denied the motion on the basis that there was no prima` facie showing that Washington law permits the marriage of two people of the same sex, and that the denial of a marriage license to two people of the same sex does not constitute an abridgement of any constitutional rights. Appellants' petition for writ of certiorari was denied by this court on September 22, 1972, but the denial was accepted as a proper notice of appeal from the trial court's order.

Appellants argue three basic assignments of error, namely, (1) the trial court erred in concluding that the Washington marriage statutes, RCW 26.04.010 *et seq.,* prohibit same-sex marriages; (2) the trial court's order violates the Equal Rights Amendment (ERA) to the Washington State Constitution, Const. art. 31, § 1; and (3) the trial court's order violates the eighth, ninth and fourteenth amendments to the United States Constitution.[1]

---

[1]Appellants also list as an "assignment of error" the assertion that the trial court's order "was based on the erroneous and fallacious conclusion that same-sex marriages are destructive to society." In support of this assertion, appellants devote nearly 40 pages of their brief to what they characterize as a discussion of "the concept of homosexuality and same-sex marriages through the eyes of other important disciplines—that of the sociologists, theologians, scientists, and doctors." Appellants state that "a basic understanding of homosexuals and society is a precondition to an enlightened discussion of the legal grounds raised . . ." Although we do not quarrel with that proposition, we deem it appropriate to observe that appellants' discussion in

Directing our attention to appellants' first assignment of error, it is apparent from a plain reading of our marriage statutes that the legislature has not authorized same-sex marriages. Appellants argue that RCW 26.04.010[2] which authorizes marriages by "persons of the age of eighteen years, who are otherwise capable" includes no requirement that marriage partners be limited to one male and one female and that the phrase "who are otherwise capable" refers to the prohibitions of RCW 26.04.020-.040 against certain marriages involving persons who are habitual criminals, diseased, insane, etc., but there is no prohibition against same-sex marriages. Appellants argue that the legislature has not defined the competency of marriage but only the competency of individuals seeking to marry; inasmuch as the appellants are both legally "capable" of marriage, they argue state law permits them to marry each other. As the state points out, however, the statutory language of RCW 26.04.010 relied upon by the appellants merely reflects a 1970 amendment which substituted the word "persons" for the prior references to "males" and "females" to implement the legislature's elimination of differing age requirements for marriage by the respective sexes. Further, RCW 26.04.210, relating to the affidavits required for the issuance of a marriage license, makes reference to "the male" and "the female" which clearly dis-

that regard does not present a legal argument, nor is there any evidence in the record to suggest that the trial court in fact based its order on the "erroneous and fallacious conclusion" to which appellants take exception. Therefore, while we recognize that appellants have presented a valuable context for the discussion of their legal points, we have endeavored to confine this opinion to discussion of the legal issues presented without attempting to present our views on matters of sociology, theology, science and medicine.

[2]At the time appellants applied for a marriage license, RCW 26.04.010, as amended in 1970, provided as follows:

"Marriage is a civil contract which may be entered into by persons of the age of eighteen years, who are otherwise capable: *Provided,* That every marriage entered into in which either party shall not have attained the age of seventeen years shall be void except where this section has been waived by a superior court judge of the county in which the female resides on a showing of necessity."

pels any suggestion that the legislature intended to authorize same-sex marriages.[3] The trial court correctly concluded that the applicable marriage statutes do not permit same-sex marriage.

Appellants next argue that if, as we have held, our state marriage laws must be construed to prohibit same-sex marriages, such laws are unconstitutional when so applied. In this context, we consider appellants' second assignment of error which is directed to the proposition that the state prohibition of same-sex marriages violates the ERA which recently became part of our state constitution.[4] The question thus presented is a matter of first impression in this state and, to our knowledge, no court in the nation has ruled upon the legality of same-sex marriage in light of an equal rights amendment. The ERA provides, in relevant part:

> Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.

In seeking the protection of the ERA, appellants argue that the language of the amendment itself leaves no ques-

---

[3]Similarly, in the 1970 version of RCW 26.04.010 which was the statute in effect when appellants applied for their license, the proviso made reference to "the female," thus implying that a male was contemplated as the other marriage partner; if same-sex marriages had been contemplated, the legislature probably would have used the plural and referred to "females." The 1973 amendment to the proviso merely eliminated the provision that the statutory age requirement could only be waived by a superior court judge of the county in which the female resides and provided that such a waiver could be granted by a superior court judge of a county in which either party resides.

It is also noteworthy that the 1972 amendments to our state community property laws (RCW 26.16), by which the legislature sought to establish sexual equality in the management of community property, retain references to "husband" and "wife." Again, it is apparent that the legislature did not contemplate that sexual equality included provision for same-sex marriage.

[4]HJR 61, commonly known as the "equal rights amendment," was approved by the voters November 7, 1972, and became effective December 7, 1972. Constitutional amendment 61, adding article 31. The language of the ERA is substantially similar to federal ERA now before the states for ratification as the twenty-seventh amendment to the United States Constitution.

tion of interpretation and that the essential thrust of the ERA is to make sex an impermissible legal classification. Therefore, they argue, to construe state law to permit a man to marry a woman but at the same time to deny him the right to marry another man is to construct an unconstitutional classification "on account of sex."[5] In response to

---

[5] Appellants also argue that prior to the November 7, 1972, election, the voters were advised that one effect of approval of the ERA (HJR 61) would be the legalization of same-sex marriages, but nevertheless voted in favor of the amendment. In this connection, appellants direct our attention to the following language in the "Statement against" HJR 61 contained in the 1972 Voters Pamphlet published by the Secretary of State:

HJR 61 would establish rules in our society which were not intended and which the citizenry simply could not support. Examples are numerous:

. . .

(3) Homosexual and lesbian marriage would be legalized, with further complication regarding adopting children into such a "family". People will live as they choose, but the beauty and sanctity of marriage must be preserved from such needless desecration;

We are not persuaded that voter approval of the ERA necessarily included an intention to permit same-sex marriages. On the contrary, the "Statement for" HJR 61 in the Voters Pamphlet indicated that the basic principle of the ERA

is that both sexes be treated equally under the law. The State could not pass or enforce any law which places a legal obligation, or confers a special legal privilege on one sex but not the other.

Similarly, the Attorney General's explanation of the effect of HJR 61, also set forth in the Voters Pamphlet, focused on the idea that government "could not treat persons differently because they are of one sex or the other." In other words, as we discuss in the body of this opinion, to be entitled to relief under the ERA, appellants must make a showing that they are somehow being treated differently by the government than they would be if they were females.

Newspaper accounts published at the time of the November 7, 1972, election also tend to discount appellants' suggestion that the voters intended to approve same-sex marriage when they supported the ERA and make it apparent that proponents of the ERA were quick to point out their disagreement with opponents' speculation about the impact of the ERA and specifically with the "Statement against" in the Voters Pamphlet. Thus, for example, in an "Election Preview" supplement to the Seattle Post-Intelligencer, November 5, 1972, the following statement appears in an article describing HJR 61 at page 10:

Opponents argue that passage [of HJR 61] would legalize homosexual marriage, deny preferential treatment to women in divorce

appellants' contention, the state points out that all same-sex marriages are deemed illegal by the state, and therefore argues that there is no violation of the ERA so long as marriage licenses are denied equally to both male and female pairs. In other words, the state suggests that appellants are not entitled to relief under the ERA because they have failed to make a showing that they are somehow being treated differently by the state than they would be if they were females. Appellants suggest, however, that the holdings in *Loving v. Virginia,* 388 U.S. 1, 9, 18 L. Ed. 2d 1010, 87 S. Ct.

settlements, make women eligible for Army combat duty, allow coed sports wrestling in schools, and eliminate preferential auto, health and life insurance rates for women.

Proponents describe the foes' contentions as emotional, irresponsible fantasies, misleading, deceptive and incorrect. HJR 61 would have none of the affects [*sic*] listed above, they say.

Similarly, in the Seattle Post-Intelligencer, October 30, 1972, the following statement appears on page A-4:

On home and social fronts, opponents [of HJR 61] fear the "beauty and sanctity of marriage" would be destroyed. But proponents say the amendment will have no effect on private life, being concerned only with what happens under the law.

They say the bill [HJR 61] would benefit both sexes and that it will have no effect on such things as homosexual marriage since laws against men or women marrying each other are not discriminating on the basis of sex.

A post-election survey of voter attitude toward HJR 61 reported in the Seattle Times, November 27, 1972, provides further evidence that public conception of HJR 61 involved its effect upon the rights of women in comparison with the rights of men and did not include any notion that HJR 61 would have an impact upon the interaction of members of the same sex. The following statement appears in the article at page A-20:

Among those with negative attitudes toward HJR 61, men outnumbered women by almost 2 to 1.

Among those with positive attitudes, there were five per cent more women than men.

The idea of the "woman as homemaker" was not a large factor among those who opposed the amendment. Most persons with negative attitudes said they took that view because they wanted to retain female legal advantages and expressed fear these would be abolished if the amendment became law.

Most of those holding positive views toward sex equality and responsibility did so on economic grounds, feeling that equal pay should be given for equal work.

1817 (1967); *Perez v. Lippold,* 32 Cal. 2d 711, 198 P.2d 17 (1948); and *J.S.K. Enterprises, Inc. v. Lacey,* 6 Wn. App. 43, 492 P.2d 600 (1971), are contrary to the position taken by the state. We disagree.

In *Loving,* the state of Virginia argued that its antimiscegenation statutes did not violate constitutional prohibitions against racial classifications because the statutes affected both racial groups equally. The Supreme Court, noting that "the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race," held that the Virginia laws were founded on an impermissible racial classification and therefore could not be used to deny interracial couples the "fundamental" right to marry. The California court made a similar ruling as to that state's antimiscegenation law in *Perez.*

Although appellants suggest an analogy between the racial classification involved in *Loving* and *Perez* and the alleged sexual classification involved in the case at bar, we do not find such an analogy. The operative distinction lies in the relationship which is described by the term "marriage" itself, and that relationship is the legal union of one man and one woman. Washington statutes, specifically those relating to marriage (RCW 26.04) and marital (community) property (RCW 26.16), are clearly founded upon the presumption that marriage, as a legal relationship, may exist only between one man and one woman who are otherwise qualified to enter that relationship.[6] Similarly although it appears that the appellate courts of this state

---

[6] In this regard, we are aided by the rule of statutory construction that words of a statute must be understood in their usual and ordinary sense in the absence of a statutory definition to the contrary. *Rena-Ware Distribs., Inc. v. State,* 77 Wn.2d 514, 463 P.2d 622 (1970); *Cramer v. Van Parys,* 7 Wn. App. 584, 500 P.2d 1255 (1972); *In re Kent,* 1 Wn. App. 737, 463 P.2d 661 (1969). We need not resort to the quotation of dictionary definitions to establish that "marriage" in the usual and ordinary sense refers to the legal union of one man and one woman.

until now have not been required to define specifically what constitutes a marriage, it is apparent from a review of cases dealing with legal questions arising out of the marital relationship that the definition of marriage as the legal union of one man and one woman who are otherwise qualified to enter into the relationship not only is clearly implied from such cases, but also was deemed by the court in each case to be so obvious as not to require recitation. *See, e.g., In re Estate of Grauel,* 70 Wn.2d 870, 425 P.2d 644 (1967); *Davis v. Davis,* 3 Wn.2d 448, 101 P.2d 313 (1940); *Weatherall v. Weetherall,* 56 Wash. 344, 105 P. 822 (1909).[7] Finally, the courts known by us to have considered the question have all concluded that same-sex relationships are outside of the proper definition of marriage. *Jones v. Hallahan,* 501 S.W.2d 588 (Ky. Ct. App. 1973); *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971); *Anonymous v. Anonymous,* 67 Misc. 2d 982, 325 N.Y.S.2d 499 (Sup. Ct. 1971). Appellants have cited no authority to the contrary.

Given the definition of marriage which we have enunciated, the distinction between the case presented by appellants and those presented in *Loving* and *Perez* is apparent. In *Loving* and *Perez,* the parties were barred from entering into the marriage relationship because of an impermissible racial classification. There is no analogous sexual classification involved in the instant case because appellants are not being denied entry into the marriage relationship because

---

[7]Of course, many other cases could be cited and, in the context of the definition of marriage, it is significant that courts considering questions involving that legal relationship frequently utilize gender-related terms such as "husband" and "wife." For example, in divorce cases, which may be characterized as cases involving the dissolution of marriage, a commonly cited rule is that the amount of alimony to be awarded, if any, "depends upon the needs of the wife and the ability of the husband to pay . . ." *Thompson v. Thompson,* 82 Wn.2d 352, 357, 510 P.2d 827 (1973); *Stacy v. Stacy,* 68 Wn.2d 573, 414 P.2d 791 (1966). Although, in appropriate circumstances, alimony may be awarded to "the husband" rather than to "the wife," it is clear that all marriages have one "husband" and one "wife." In the relationship proposed by appellants, there is no "wife" and therefore there can be no marriage.

of their sex; rather, they are being denied entry into the marriage relationship because of the recognized definition of that relationship as one which may be entered into only by two persons who are members of the opposite sex.[8] As the court observed in *Jones v. Hallahan, supra* at 590: "In substance, the relationship proposed by the appellants does not authorize the issuance of a marriage license because what they propose is not a marriage." *Loving* and *Perez* are inapposite.

*J.S.K. Enterprises, Inc. v. Lacey, supra,* is also factually and legally dissimilar to the case at bar. In that case, this court held that a city ordinance which permitted massagists to administer massages only to customers of their own sex constituted discrimination on the basis of sex, prohibited by

---

[8]Appellants argue that *Loving* and *Perez* are analogous to the case at bar notwithstanding what might be the "definition" of marriage. They argue that at the time *Loving* and *Perez* were decided, marriage *by definition* barred interracial marriages and that the *Loving* and *Perez* courts changed that definition through their interpretation of the Fourteenth Amendment. Appellants suggest that the ERA operates in a manner analogous to the Fourteenth Amendment to require us to change the definition of marriage to include same-sex marriages. We disagree. The *Loving* and *Perez* courts did not change the basic definition of marriage as the legal union of one man and one woman; rather, they merely held that the race of the man or woman desiring to enter that relationship could not be considered by the state in granting a marriage license. In other words, contrary to appellants' contention, the Fourteenth Amendment did not require any change in the definition of marriage and, as we hold today, neither does the ERA.

To further illustrate our view, we suggest two examples of a situation which, contrary to the situation presented in the case at bar, would raise questions of possible sexual discrimination prohibited by the ERA. First, if the antimiscegenation statutes involved in *Loving* and *Perez* had permitted white males to marry black females but prohibited white females from marrying black males, then it is arguable that the statutes would be invalid not only because of an impermissible racial classification under the Fourteenth Amendment but also because of an impermissible sexual classification under the ERA. Second, if the state legislature were to change the definition of marriage to include the legal union of members of the same sex but also provide that marriage licenses and the accompanying protections of the marriage laws could only be extended to male couples, then it is likely that the state marriage laws would be in conflict with the ERA for failure to provide equal benefits to female couples.

the equal protection clause of the fourteenth amendment to the United States Constitution, and also violated RCW 49.12.200, relating to the right of women to pursue any employment. We see no analogy between the right of women to administer massages to men and the question of whether the prohibition against same-sex marriages is unconstitutional. The right recognized in *J.S.K. Enterprises, Inc.,* on the basis of principles applicable to employment discrimination has nothing to do with the question presented by appellants.

Appellants apparently argue, however, that notwithstanding the fact that the equal protection analysis applied in *Loving, Perez* and *J.S.K. Enterprises, Inc.,* may render those cases distinguishable from the case at bar, the absolute language of the ERA requires the conclusion that the prohibition against same-sex marriages is unconstitutional. In this context, appellants suggest that definition of marriage, as the legal union of one man and one woman, in and of itself, when applied to appellants, constitutes a violation of the ERA. Therefore, appellants contend, persons of the same sex must be presumed to have the constitutional right to marry one another in the absence of a countervailing interest or clear exception to the ERA.

Appellants cite no case law in support of their position, but direct our attention to the analysis set forth in Note, *The Legality of Homosexual Marriage,* 82 Yale L.J. 573 (1973), and in Brown, Emerson, Falk & Freeman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871 (1971). The latter article, however, is clearly written in the context of the impact of the ERA upon the rights of women and men as individuals and the authors make no suggestion that the ERA requires a change in the definition of marriage to include same-sex relationships.[9] The authors suggest that

---

[9]The authors describe the basic principle of the ERA in part as follows, at page 889:

"The basic principle of the Equal Rights Amendment is that sex is not a permissible factor in determining the legal rights of women, or of

the ERA prohibition of sex discrimination is "absolute," meaning that one person may not be favored over another where sex is the only distinguishing factor between the two. In that context, the authors state at page 892:

> From this analysis it follows that the constitutional mandate must be absolute. The issue under the Equal Rights Amendment cannot be different but equal, reasonable or unreasonable classification, suspect classification, fundamental interest, or the demands of administrative expediency. Equality of rights means that sex is not a factor. This at least is the premise of the Equal Rights Amendment.

The author of the note, *The Legality of Homosexual Marriage, supra,* applies the aforementioned analysis of the ERA in the totally different context of same-sex relationships and thus concludes that the ERA requires that such relationships be accommodated by state marriage laws. We are not persuaded by such reasoning. We do not believe that approval of the ERA by the people of this state reflects any intention upon their part to offer couples involved in same-sex relationships the protection of our marriage laws. A consideration of the basic purpose of the ERA makes it apparent why that amendment does not support appellants' claim of discrimination. The primary purpose of the ERA is to overcome discriminatory legal treatment as between men and women "on account of sex." The popular slogan,

---

men. This means that the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other. The law does, of course, impose different benefits or different burdens upon different members of the society. That differentiation in treatment may rest upon particular characteristics or traits of the persons affected, such as strength, intelligence, and the like. But under the Equal Rights Amendment the existence of such a characteristic or trait to a greater degree in one sex does not justify classification by sex rather than by the particular characteristic or trait. Likewise the law may make different rules for some people than for others on the basis of the activity they are engaged in or the function they perform. But the fact that in our present society members of one sex are more likely to be found in a particular activity or to perform a particular function does not allow the law to fix legal rights by virtue of membership in that sex. In short, sex is a prohibited classification."

"Equal pay for equal work," particularly expresses the rejection of the notion that merely because a person is a woman, rather than a man, she is to be treated differently than a man with qualifications equal to her own.

Prior to adoption of the ERA, the proposition that women were to be accorded a position in the law inferior to that of men had a long history.[10] Thus, in that context, the purpose of the ERA is to provide the legal protection, as between men and women, that apparently is missing from the state and federal Bills of Rights, and it is in light of that purpose that the language of the ERA must be construed. To accept the appellants' contention that the ERA must be interpreted to prohibit statutes which refuse to permit same-sex marriages would be to subvert the purpose for which the ERA was enacted by expanding its scope beyond that which was undoubtedly intended by the majority of the citizens of this state who voted for the amendment.

■ We are of the opinion that a commonsense reading of the language of the ERA indicates that an individual is afforded no protection under the ERA unless he or she first demonstrates that a right or responsibility has been denied

---

[10]For example, Mr. Justice Bradley, in his concurring opinion upholding the refusal of a state court to license a woman to practice law in *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 21 L. Ed. 442 (1872), stated in part at page 141:

[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. . . .

. . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator.

solely because of that individual's sex. Appellants are unable to make such a showing because the right or responsibility they seek does not exist. The ERA does not create any new rights or responsibilities, such as the conceivable right of persons of the same sex to marry one another; rather, it merely insures that existing rights and responsibilities, or such rights and responsibilities as may be created in the future, which previously might have been wholly or partially denied to one sex or to the other, will be equally available to members of either sex. The form of discrimination or difference in legal treatment which comes within the prohibition of the ERA necessarily is of an invidious character because it is discrimination based upon the fortuitous circumstance of one's membership in a particular sex per se. This is not to say, however, that the ERA prohibits all legal differentiations which might be made among males and females. A generally recognized "corollary" or exception to even an "absolute" interpretation of the ERA is the proposition that laws which differentiate between the sexes are permissible so long as they are based upon the unique physical characteristics of a particular sex, rather than upon a person's membership in a particular sex per se. *See* Brown, Emerson, Falk & Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women, supra* at 893-96.

In the instant case, it is apparent that the state's refusal to grant a license allowing the appellants to marry one another is not based upon appellants' status as males, but rather it is based upon the state's recognition that our society as a whole views marriage as the appropriate and desirable forum for procreation and the rearing of children. This is true even though married couples are not required to become parents and even though some couples are incapable of becoming parents and even though not all couples who produce children are married. These, however, are exceptional situations. The fact remains that marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race.

Further, it is apparent that no same-sex couple offers the possibility of the birth of children by their union. Thus the refusal of the state to authorize same-sex marriages results from such impossibility of reproduction rather than from an invidious discrimination "on account of sex." Therefore, the definition of marriage as the legal union of one man and one woman is permissible as applied to appellants, notwithstanding the prohibition contained in the ERA, because it is founded upon the unique physical characteristics of the sexes and appellants are not being discriminated against because of their status as males per se. In short, we hold the ERA does not require the state to authorize same-sex marriage.

■■■ Appellants' final assignment of error is based primarily upon the proposition that the state's failure to grant them a marriage license violates the equal protection clause of the fourteenth amendment to the United States Constitution.[11] The threshold question presented involves the standard by which to measure appellants' constitutional argument. We have held that the effect of our state marriage statutes is to prohibit same-sex marriages, and as a general proposition such statutes must be presumed constitutional. *See Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n*, 83 Wn.2d 523, 520 P.2d 162 (1974). The operative effect of such a presumption is that the statutory classification in question—the exclusion of same-sex relationships from the definition of marriage—does not offend the equal protection clause if it rests upon some reasonable basis. *Dandridge v. Williams*, 397 U.S. 471,

---

[11]Appellants also claim that their rights under the Eighth and Ninth Amendments, and under the due process clause of the Fourteenth Amendment have been violated. In view of the conclusion we have reached with reference to appellants' claim under the equal protection clause of the Fourteenth Amendment, we deem it unnecessary to discuss appellants' contentions with regard to the right to privacy under the Ninth Amendment and the right to due process under the Fourteenth Amendment. Further, we have determined that appellants' argument that denial of a marriage license to them constitutes cruel and unusual punishment prohibited by the Eighth Amendment is without merit.

25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970); *Caughey v. Employment Sec. Dept,* 81 Wn.2d 597, 503 P.2d 460 (1972).

Appellants contend, however, that a standard stricter than such a "reasonable basis" test must be applied to the operation of our state marriage laws. Appellants point out that a fundamental right—the right to marry—is at stake in the instant litigation, directing our attention to *Loving v. Virginia, supra; Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942); and *Meyer v. Nebraska,* 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (1923). Moreover, appellants, reasoning primarily by analogy from *Loving* and related cases, argue that the statutory prohibition against same-sex marriages constitutes a classification based upon sex. Therefore, appellants urge that the applicable standard under the equal protection clause requires that the classification be deemed "inherently suspect" and one which may not be sustained unless the state demonstrates that a "compelling state interest" so requires. *See Sail'er Inn, Inc. v. Kirby,* 5 Cal. 3d 1, 485 P.2d 529, 95 Cal. Rptr. 329 (1971).

We do not take exception to the proposition that the equal protection clause of the Fourteenth Amendment requires strict judicial scrutiny of legislative attempts at sexual discrimination. Our state Supreme Court has held that a legislative classification based upon sex is inherently suspect, *Hanson v. Hutt,* 83 Wn.2d 195, 517 P.2d 599 (1973), as has a plurality of the United States Supreme Court, *Frontiero v. Richardson,* 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973). As we have already held in connection with our discussion of the ERA, however, appellants do not present a case of sexual discrimination. Appellants were not denied a marriage license because of their sex; rather, they were denied a marriage license because of the nature of marriage itself.

Appellants appear to recognize the distinction we make because they also argue that the definition of marriage as it is reflected in our marriage statutes constitutes an inherently suspect classification because it discriminates against

homosexuals as a group. In other words, appellants appear to present the alternative argument that although they are not being discriminated against because they are males, they are being discriminated against because they happen to be homosexual.

Although appellants present argument to the contrary,[12] we agree with the state's contention that to define marriage to exclude homosexual or any other same-sex relationships is not to create an inherently suspect legislative classification requiring strict judicial scrutiny to determine a compelling state interest. *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971); *see Jones v. Hallahan, supra; Anonymous v. Anonymous, supra; see generally* Note, *The Legality of Homosexual Marriage, supra* at 574-83. The state contends that the exclusion of same-sex relationships from our marriage statutes may be upheld under the traditional "reasonable basis" or "rational relationship" test to which we have previously made reference. We agree.[13]

There can be no doubt that there exists a rational basis for the state to limit the definition of marriage to exclude

---

[12]Appellants argue, in part, that homosexuals constitute a class having characteristics making any legislative classification applicable to them one having common denominators of suspectability. Thus, they argue homosexuals constitute "a politically voiceless and invisible minority," *see Hobson v. Hansen*, 269 F. Supp. 401, 508 (D.D.C. 1967); that being homosexual, generally speaking, is an immutable characteristic, *see Korematsu v. United States*, 323 U.S. 214, 89 L. Ed. 194, 65 S. Ct. 193 (1944); and that homosexuals are a group with a long history of discrimination subject to myths and stereotypes. *See generally* Note, *The Legality of Homosexual Marriage, supra* at 575-78.

We are not unmindful of the fact that public attitude toward homosexuals is undergoing substantial, albeit gradual, change. *See generally* Comment, *Homosexuality and the Law—A Right to be Different?*, 38 Albany L. Rev. 84 (1973). Notwithstanding these considerations, we express no opinion upon the desirability of revising our marriage laws to accommodate homosexuals and include same-sex relationships within the definition of marriage. That is a question for the people to answer through the legislative process. We merely hold such a legislative change is not constitutionally required.

[13]Appellants suggest that there is an intermediate "balancing" test applicable to equal protection analysis which allows no presumption in favor of the interests of either the individual or the state. Such an

same-sex relationships. Although, as appellants contend, other cultures may have fostered differing definitions of marriage, marriage in this state, as elsewhere in the nation, has been deemed a private relationship of a man and a woman (husband and wife) which involves "interests of basic importance in our society." *See Boddie v. Connecticut,* 401 U.S. 371, 376, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971). Accordingly, subject to constitutional limitations, the state has exclusive dominion over the legal institution of marriage and the state alone has the "prerogative of creating and overseeing this important institution." *Coleman v. Coleman,* 32 Ohio St. 2d 155, 160, 291 N.E.2d 530 (1972). *See also O'Neill v. Dent,* 364 F. Supp. 565 (E.D.N.Y. 1973).

We do not seek to define in detail the "interests of basic importance" which are served by retaining the present definition of marriage as the legal union of one man and one woman. The societal values which are involved in this area must be left to the examination of the legislature. *See*

intermediate test, which some commentators have argued represents a merger of or departure from the "two tier" analysis involved in the application of the "strict scrutiny" and "rational basis" tests, may well be implied by recent opinions of the United States Supreme Court. *See, e.g., Frontiero v. Richardson, supra; Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *see generally* Gunther, *The Supreme Court—1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: a Model for New Equal Protection,* 86 Harv. L. Rev. 1 (1972); Comment, *Constitutional Law — Equal Protection — Fifth Amendment, Due Process—Plurality of Court Decides that Sex-Based Classifications Are "Suspect," Frontiero v. Richardson,* 5 Rutgers-Camden L.J. 348 (1974); Comment, *Toward Sexual Equality? An Analysis of Frontiero v. Richardson,* 59 Iowa L. Rev. 377 (1973); Note, *The Legality of Homosexual Marriage, supra* at 574. Whatever the merits of such academic analysis, it is our view that the so-called traditional "rational relationship" test necessarily involves a balancing of the nature of a particular legislative classification, the interests of the individual affected by such classification, and the interests of the state (presumption of constitutionality) applicable to such legislative classification. Therefore, we shall continue to refer to the alternative tests of "strict scrutiny" and "rational basis" because there appears to be no need to define an intermediate test. *Hanson v. Hutt, supra; Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, supra; Thurston v. Greco,* 78 Wn.2d 424, 474 P.2d 881 (1970); *State v. Persinger,* 62 Wn.2d 362, 382 P.2d 497 (1963).

*Moran v. School Dist. 7,* 350 F. Supp. 1180 (D. Mont. 1972). For constitutional purposes, it is enough to recognize that marriage as now defined is deeply rooted in our society. Although, as appellants hasten to point out, married persons are not required to have children or even to engage in sexual relations, marriage is so clearly related to the public interest in affording a favorable environment for the growth of children that we are unable to say that there is not a rational basis upon which the state may limit the protection of its marriage laws to the legal union of one man and one woman. Under such circumstances, although the legislature may change the definition of marriage within constitutional limits, the constitution does not require the change sought by appellants. As the court observed in *Baker v. Nelson, supra* at 312-13:

> The institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis. . . . This historic institution manifestly is more deeply founded than the asserted contemporary concept of marriage and societal interests for which petitioners contend. The due process clause of the Fourteenth Amendment is not a charter for restructuring it by judicial legislation.
>
> . . .
>
> The equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry.

Thus, for the reasons stated in this opinion, we hold that the trial court correctly concluded that the state's denial of a marriage license to appellants is required by our state statutes and permitted by both the state and federal constitutions.

The judgment is affirmed.

HOROWITZ and JAMES, JJ., concur.

Petition for rehearing denied July 18, 1974.

Review denied by Supreme Court October 10, 1974.