**Richard Frank ADAMS and Anthony Corbett Sullivan, Plaintiffs,**

v.

**Joseph D. HOWERTON, Acting District Director of the Immigration and Naturalization Service of the United States Department of Justice, Defendant.**

**No. CV 79–1003–IH.**

United States District Court,
C. D. California.

Feb. 25, 1980.

---

Brown, Weston & Sarno by David M. Brown, Beverly Hills, Cal., and American Civil Liberties Union Foundation by Fred Okrand, Los Angeles, Cal., for plaintiffs.

Andrea Sheridan Ordin, U. S. Atty. by Eva S. Halbreich, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

## ORAL OPINION DELIVERED FROM THE BENCH (MODIFIED)

IRVING HILL, Chief Judge:

The Court has before it today cross-motions for summary judgment. Both sides agree that the case is ripe for summary judgment and both agree that there is no bona fide dispute of material fact and that the only issue presented is one of law.

The uncontradicted facts are these: Plaintiff Adams is an American citizen. Plaintiff Sullivan is an Australian citizen who came to this country in 1973 on a non-immigrant visitor's visa which would have expired on January 7, 1974. Both Plaintiffs are males. On January 5, 1974, two days before his visa expired, Sullivan went through a ceremony of marriage with a lady named Mary Egleston and applied for a change of status to the status of "immediate relative" of Mary Egleston. That status permits permanent residence in this country.

The status of "immediate relative" was first granted. It was later revoked by the INS on the grounds that there was no bona fide marriage between Sullivan and Mary Egleston. Thereafter that marriage was legally annulled.

Later, Mr. Sullivan secured a license from the County Clerk in Boulder, Colorado, to marry Mr. Adams. The two of them went through a purported ceremony of marriage, performed by a minister, in Colorado on April 21, 1975. Nothing has been done in Colorado since that date to void that "marriage."

Four days after that ceremony, on April 25, 1975, Mr. Adams filed a petition with INS to have Mr. Sullivan classified as his, Adams', "immediate relative." This classi-

fication was denied administratively. On final administrative appeal, the denial was affirmed, and the case came here.

The present action seeks a declaration compelling the granting of "immediate relative" status to Mr. Sullivan on the ground that the administrative denial was an abuse of discretion and an error of law.

The complaint also seeks an injunction against the commencement of deportation proceedings against Mr. Sullivan.

The only evidence before me is the administrative record, but it supplies all of the factual information.

The law that the Court must construe is a section of the Immigration and Naturalization Code that provides for the status of "immediate relative." The section is 8 U.S.C., Section 1151(b). It defines the term "immediate relatives" as follows:

". . . the children, spouses, and parents of a citizen of the United States."

The only one involved here is the term "spouses." The section doesn't include any further definition of the term "spouses." Nor is there any definition of that term in other sections of the immigration law except for 8 U.S.C., Section 1101(a)(35). That section provides that the term "spouses" does not include:

". . . a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated."

Plaintiffs contend in this case that under both Colorado and federal law the two males are married to each other and are thus spouses of each other. They contend that if the governing law deprives them of the status of being married to each other and of being a spouse to each other, it is unconstitutional under due process and equal protection.

The government contends that one cannot be married to a person of the same sex and thus, if they are of the same sex, one may not be a spouse to the other. That result is urged under both Colorado and federal law.

The government also contends that whether federal or state law governs, there is no constitutional infirmity in that result.

The final administrative decision in the INS is the decision of the Board of Immigration Appeals found at page 3 of the Administrative Record. It applies only Colorado law and does not deal with any constitutional argument, although constitutional arguments were made in the administrative phase of the case.

That is the posture of the matter as it presents itself to this Court. This Court must first address the question of what law governs the determination of whether Adams and Sullivan are married and are spouses of each other.

We are construing a federal immigration statute. But there are a number of cases which hold that in deciding whether a marriage was valid, the INS, in its administration of the immigration laws, will apply the law of the place where the marriage was entered into. The only Circuit Court case we have found is *On v. Brownell*, 253 F.2d 814 (5th Cir. 1958), but there are a number of Board of Immigration appeals decisions to the same effect. See e. g., *Matter of P.*, 4 I & N Dec. 610 (B.I.A. 1952); *Matter of Levine*, 13 I & N Dec. 244 (B.I.A. 1969).

This reference to state law is, as I have said, an approach that is sanctioned by some cases. However, since we are dealing with an act of Congress, we have to recognize that Congress in its immigration statutes is not obligated to follow the law of the place where the marriage was contracted. One instance where Congress specifically declined to do so is Section 1101(a)(35), quoted above, in which marriages made when the parties were not in each other's presence are not recognized as marriages for purposes of the immigration laws even though they may have been considered valid by the law of the place of celebration.

There are many other cases in which for immigration purposes marriages apparently valid under the law of the place where they were contracted have been ruled not mar-

riages for immigration purposes because they are determined not to have been bona fide marriages. We have such cases in our own Circuit, one of which is *Volianitis v. INS*, 352 F.2d 766 (9th Cir. 1965) (marriage not recognized because contracted for sole purpose of permitting alien to remain in U.S.).

■ I deduce from all of this the following rule of law: For immigration purposes, whether one is married to another, or is the spouse of another, is governed by congressional intent. It is the congressional intent that one look to the law of the jurisdiction where the marriage was contracted to determine its validity. But that is not an absolute and totally governing criterion. If the state law (or in certain instances the foreign law) is one which offends federal public policy, Congress is deemed to have intended federal public policy to prevail.[1]

We now pass on to examine the validity of this alleged marriage under Colorado law. There aren't any Colorado cases on the subject. The Colorado statutes don't specifically allow, nor do they specifically prohibit, marriages between persons of the same sex. There are a group of Colorado statutes on marriage commencing at Colorado Revised Statutes, Section 14–2–101. They do not contain, as I have stated, any sanction or prohibition of marriages between persons of the same sex, and only one of those sections refers to the sex of the persons involved in a marriage. It is Section 14–2–104, which provides:

> "Formalities. A marriage between a man and a woman licensed, solemnized, and registered as provided in this part 1 is valid in this state."

■ I extrapolate from that section, and hold, that the term "marriage" as used throughout Colorado law refers to a contract and ceremony involving, as the above section says, "a man and a woman." And

that is also the opinion of the Colorado Attorney General.

In an informal unpublished opinion addressed to a member of the Colorado Legislature three days after the "marriage" in question in this case occurred, the Colorado Attorney General said that purported marriages between persons of the same sex were of no legal effect in Colorado. [This opinion is found at page 48 of the Administrative Record.]

The Attorney General's opinion articulates a proposition of law which I adopt and which is central to the instant case. That proposition is this: The term "marriage," (and therefore the term "spouse" which is derivative from the term "marriage,"[2]) necessarily and exclusively involves a contract, a status, and a relationship between persons of different sexes. That is the way the term "marriage" is defined in every legal source that I have examined, starting with Black's Law Dictionary. This rule of law, this construction of what a marriage is, is the holding of a number of cases in various states. Among them are: *Anonymous v. Anonymous*, 67 Misc.2d 982, 325 N.Y.S.2d 499 (1971); *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed for want of a substantial question, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972); *Jones v. Hallahan*, 501 S.W.2d 588 (Ky.1973); and *Singer v. Hara*, 11 Wash. App. 247, 522 P.2d 1187 (1974). Of all those opinions, *Singer v. Hara* is the best reasoned. But the most important precedent is *Baker v. Nelson*, the Minnesota case, as explained below.

There is an interesting article, Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States*, 30 Hastings L.J. 799, 874–78 (1979) which reviews much of the decided case law in this field. As that article says, no court

---

1. In certain other areas, unrelated to immigration, a similar rule of law has been enunciated. *See, e. g., De Sylva v. Ballentine*, 351 U.S. 570, 580–81, 76 S.Ct. 974, 979–80, 100 L.Ed. 1415 (1956); *R. F. C. v. Beaver County*, 328 U.S. 204, 208–10, 66 S.Ct. 992, 994–95, 90 L.Ed. 1172 (1946).

2. The dictionary definition of the term "spouse" is "a husband or wife; either member of a married couple spoken of in relation to the other." Webster's New Twentieth Century Dictionary, Unabridged. (1960)

has yet recognized a union between persons of the same sex as being a legal marriage, and that is the view of this Court as well.

■ Now we must go on to discuss federal law. If the Colorado law was the other way and recognized the validity of this purported marriage, I would nevertheless affirm the INS and grant judgment for the government on the ground that such Colorado law would violate federal public policy.

If one is to articulate the federal public policy involved and the reasons for refusing to recognize that a "marriage" can exist between two people of the same sex, one ought to explore the societal values which underlie the recognition of marriage and the reasons that it has been a preferred and protected legal institution. Those societal values are well described in the case of *Singer v. Hara, supra,* as follows:

> "[M]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race." 522 P.2d at 1195.

The definition of marriage, the rights and responsibilities implicit in that relationship, and the protections and preferences afforded to marriage, are now governed by the civil law. The English civil law took its attitudes and basic principles from canon law, which, in early times, was administered in the ecclesiastical courts.[3] Canon law in both Judaism and Christianity could not possibly sanction any marriage between persons of the same sex because of the vehement condemnation in the scriptures of both religions of all homosexual relationships.[4] Thus there has been for centuries a combination of scriptural and canonical teaching under which a "marriage" between persons of the same sex was unthinkable and, by definition, impossible.

The legal protection and special status afforded to marriage (being defined as an union of persons of different sex) has historically, as stated in the above quotation from *Singer,* been rationalized as being for the purpose of encouraging the propagation of the race. Wholly apart from canon law and scripture, if propagation of the race is basic to the concept of marriage and its legal attributes, "marriage" is again impossible and unthinkable between persons of the same sex.

In light of this history, it seems clear to me that Congress, as a matter of federal law, did not intend that a person of one sex could be a "spouse" to a person of the same sex for immigration law purposes, and strong federal policy precludes such an interpretation.

Possibly anticipating this decision as announced to this point, Plaintiffs retreat to a second line of defense, the claim that each of them is a "putative spouse" of the other. I reject this claim. The entire concept of putative spouse requires that the claimant entertain a good faith belief in the validity of his marriage to another. Given the scriptural, canonical, and civil law authorities which I have mentioned, and given the prevailing mores and moral concepts of this age, one could not entertain a good faith belief that he could be married to a person of the same sex. In our society, the questionable validity of same-sex marriages is such that all persons must be deemed on notice of the possible invalidity thereof.

I, therefore, hold that if Colorado law governs, it does not allow putative status to those claiming to be spouses of persons of the same sex. Even if Colorado law were different and recognized that the relationship of putative spouses could arise in a same-sex context, I find that Congress, for immigration purposes, would not recognize that relationship under 8 U.S.C. Section 1151(b), because so doing would be against federal policy. As stated above, the Congressional will clearly takes precedence over inconsistent state law in this area.

I have thus far held that Plaintiffs' claim that they are married to each other and are spouses of each other must be rejected un-

---

**3.** See 52 Am.Jur.2d 865, *Marriage* Section 2.

**4.** See Friedman, *Constitutional and Statutory Challenges to Discrimination in Employment* *Based on Sexual Orientation,* 64 Iowa L.Rev. 527, 529 (1979).

der both Colorado and federal statutory law. I pass now to their claim that such a statutory construction involves a denial of constitutional rights under the equal protection and due process clauses.

■ I reject Plaintiffs' constitutional challenges. If federal law governs (and it does govern as I have defined and construed it), the constitutional challenge is rejected as insubstantial. The leading case on that is the recent decision of the Supreme Court in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977).

In that case Congress had provided that the illegitimate child of a mother is her "immediate relative" for immigration purposes, but the illegitimate child of a father is not his "immediate relative." The Supreme Court rejected an equal protection challenge and held that Congress has virtually plenary power in immigration matters and is not bound by otherwise applicable equal protection requirements.

If, on the other hand, state law governs, the Colorado state law which rejects a purported marriage between persons of the same sex does not violate the due process or the equal protection clause of the federal constitution. I think that holding is justified and supported by the Supreme Court's dismissal of the appeal in *Baker v. Nelson, supra.*

*Baker* is of paramount importance because a state court judgment prohibiting two people of the same sex from marrying each other was appealed to the U. S. Supreme Court on various constitutional grounds, including due process and equal protection. The High Court dismissed the appeal for want of a substantial federal question. Such a dismissal is an important adjudication on the merits. The effect of such a dismissal is explained by the Supreme Court in another case, *Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975), and the explanation given there makes it clear that such a dismissal is a *holding* that the constitutional challenge was considered by the Supreme Court and rejected as insubstantial. The Court goes on to say in *Hicks v. Miranda*

that lower courts are bound by such a holding of insubstantiality.

My holding is also supported by the unvarying legal concept and definition of what marriage is, as discussed earlier. If that concept requires persons of different sexes, there can be no equal protection or due process violation when persons of the same sex attempt to bring themselves within the meaning of the term "marriage" or "spouse." Whatever classification may be involved is thus reasonable and proper.

I believe the *Baker* case is controlling, but if for some reason it is not, I reach the same result under a *de novo* look at the constitutional issues. As developed earlier, the main justification in this age for societal recognition and protection of the institution of marriage is procreation, perpetuation of the race. Plaintiffs argue that some persons are allowed to marry and their union is given full recognition and constitutional protection even though the above stated justification—procreation—is not possible. They point to marriages being sanctioned between couples who are sterile because of age or physical infirmity, and between couples who make clear that they have chosen not to have children. Plaintiffs go on to claim that sanctioning such unions within the protection of legal marriage, while excluding their union, constitutes an illegal discrimination against them. In my view, if the classification of the group who may validly marry is overinclusive, it does not affect the validity of the classification. In traditional equal protection terminology, it seems beyond dispute that the state has a compelling interest in encouraging and fostering procreation of the race and providing status and stability to the environment in which children are raised. This has always been one of society's paramount goals. There is no real alternative to some overbreadth in achieving this goal. The state has chosen to allow legal marriage as between all couples of opposite sex. The alternative would be to inquire of each couple, before issuing a marriage license, as to their plans for children and to give sterility tests to all appli-

cants, refusing licenses to those found sterile or unwilling to raise a family. Such tests and inquiries would themselves raise serious constitutional questions. See *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965).

Thus, it seems to me that the state has chosen the least intrusive alternative available to protect the procreative relationship. When the legislative classification is narrowly tailored to serve a compelling state interest, there is no constitutional infirmity even when there is a strict scrutiny requirement.[5] Such a narrowly tailored classification exists here.

I am, of course, aware of the recent trend of judicial decisions which prohibits discrimination against homosexuals in employment and other areas. There is even a district court case which says the INS is prohibited from denying citizenship to one otherwise eligible therefor on the sole ground of homosexuality. *In re Brodie*, 394 F.Supp. 1208 (D.Ore.1975). But all these cases are, in my view, off the point in terms of the question that is before the Court today.

The time may come, far in the future, when contracts and arrangements between persons of the same sex who abide together will be recognized and enforced under state law. When that time comes, property rights and perhaps even mutual obligations of support may well be held to flow from such relationships. But in my opinion, even such a substantial change in the prevailing mores would not reach the point where such relationships would be characterized as "marriages". At most, they would become personal relationships having some, but not all, of the legal attributes of marriage. And even when and if that day arrives, two persons of the same sex, like those before the Court today, will not be thought of as being "spouses" to each other within the meaning of the immigration laws. For that result to obtain, an affirmative enactment of Congress will be required.

Plaintiffs' motion for summary judgment is denied. The government's motion for summary judgment is granted.

---

**5.** I am not here deciding whether the strict scrutiny test is applicable. At this point it is unclear whether homosexuals are a suspect class for equal protection purposes.