## DeSanto v. Barnsley

*Rosalie G. Davies,* for plaintiff.
*H. Lee Weinrebe,* for defendant.

DEFURIA, *J.*, February 17, 1982—On or about February 6, 1981, plaintiff, John DeSanto, filed a complaint in divorce. Paragraph four of said complaint alleges:

"The parties were married on the 14th day of June, 1970, at Yeadon, Pennsylvania. A common law marriage was created between the parties by ceremony before friends on June 14, 1970 and continues until the present time."

Defendant, William Barnsley, filed an answer to said complaint, denying that the parties were ever, or were ever capable in fact of being "married" at any time whatsoever.

Plaintiff subsequently filed a petition to determine marital status pursuant to the Pennsylvania Divorce Code of 1980. A hearing on said petition was held on November 18, 1981. The parties were thereafter invited to submit memoranda of law. Plaintiff filed a memoranda of law in support of the petition to determine marital status. Defendant has failed to file a memorandum or brief in support of his position.

Section 206 of the Divorce Code of 1980 provides in pertinent part:

"When the validity of any marriage shall be denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of validity or invalidity of the marriage. . . ."

The undisputed facts in this case are that plaintiff and defendant are males; that they did not apply for, nor were issued a marriage license; that they did not otherwise attempt to comply with the requirements of the Marriage Law of 1953.[1] We note that sections

---

1. Act of 1953, Aug. 22, P.L. 1344, §23.

1-3 of the Marriage Law requires a male and female applicant.

However, section 1-23 of the Marriage Law states:

## COMMON LAW MARRIAGE

"Nothing herein shall be construed to change the existing law with regard to common law marriage." A common law marriage is one effected by agreement of the parties without the benefit of the formality of a church ceremony or officiating officer, and without a license. In re: Manfredi's Estate, 399 Pa. 285, 159 A.2d 697 (1960). A common law marriage may be created by uttering words in present tense with intent to establish a marital relationship. Com. v. Sullivan, 484 Pa. 130, 398 A.2d 978 (1979).

The question for decision is whether two persons of the same sex can validly contract a common law marriage. We think not.

The petition to determine marital status raises a novel issue. For, while a few jurisdictions have confronted the question of whether a marriage of two persons of the same sex is authorized by their respective marriage statutes[2], this court is unaware of, and the parties have not directed the court to, any decisions relating to same-sex common law marriages.

Therefore, we must begin with the definition of marriage. Webster's Third New International Dictionary, (1966) page 1384, gives the following primary meaning to marriage:

"1. (a) the state of being united to a person of the opposite sex as husband or wife. . . ."

---

2. See 63 A.L.R. 3d 1199 and cases cited therein.

In Black's Law Dictionary, Fourth Edition, page 1123, this definition is stated:

"Marriage . . . is the civil status, condition or relation of one man and one woman united in law for life for discharge to each other and the community of the duties legally encumbant on those whose association is founded on the distinction of sex." (citing cases).

The above definitions and constructions of the term "marriage" are declared in a number of cases of various states. See Anonymous v. Anonymous, 67 Misc. 2d 982, 325 N.Y.S. 2d 499 (1971) wherein the court said:

". . . Marriage is and always has been a contract between a man and a woman. . . . It may be more particularly defined as the voluntary union for life of one man and one woman as husband and wife. . . ." Baker v. Nelson, 291 Minn. 310, 191 N.W. 2d k85 (1971); Appeal dismissed 409 U.S. 810, 93 S. Ct. 37, 34 L.Ed. 2d 65 (1972); Jones v. Hallighan, 501 S.W. 2d 588 (Ky. 1973); Singer v. Hara, 11 Wash. App. 247, 522 P.2d 1187 (1974).

The definition of marriage, the rites and responsibilities implicit in that relationship and the protections and preferences afforded the marriage are founded in the English civil law, which took its attitudes and basic principles from the canon law, administered in the early times by the Ecclesiastical Courts.[3] Adams v. Howerton, 486 F.Supp. 1119 (1980). After the establishment of the United States as an independent nation, the legislatures of the various states vested jurisdiction of marriage and divorce in the civil courts, intending that the principles of law developed by the Ecclesiastical Courts,

---

3. See 52 Am. Jur. 2d 865, Marriage Section 2.

be applied except where modified or limited by statute. LeBarron v. LeBarron, 35 Vt. 365 (1862) approved in Spannuth v. Spannuth, 25 D. & C. 216, 218-219 (1935); see 27A CJS Divorce §3.

Among those principles developed by the Ecclesiastical Courts was that the institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis itself. Baker v. Nelson, Supra.

Moreover, the English civil law refused to sanction "marriages" that violated Judeo-Christian teaching. The statute of 32 Hen. VII c 38 applied the exact degree of consanguinity found in Leviticus XX, 11-21, in proscribing marriages by certain related parties.

Petitioner argues that the omission of same sex marriages from the list of consanguineous couples found in section 402(a)(2) of the Divorce Code of 1980 makes it clear that there is no statutory impediment to a finding of common law marriage in the instant case. We do not regard this omission as evidencing a legislative intent to validate such a liason. Rather, we think that a sensible reading of the statute disclosed a contrary intent. It is unrealistic to think that the drafters of our most recent Divorce Code would have thought to be changing the common understanding of the term "marriage by employing in the statute words replete with heterosexual import, such as "man and women", "husband and wife", "spouse", etc.

Additionally, we are mindful that the cohabitation attendant to a "marriage" between these parties had been a crime from as early as the statute of 1533; statute 25 Hen. VIII c 6 (see Pollock and Maitland, History of the English Law, vol. II p. 556, 557, 2 ed. (1923)) and remained so in this jurisdiction until

May 30, 1980 with the decision of Commonwealth v. Bonadio, 490 Pa. 91, 415 A.2d 47 (1980), which decision was rendered two months after the effective date of the present Divorce Code. As we said in Adams v. Howerton, supra:

"Thus there has been for centuries a combination of scriptural and canonical teaching under which a 'marriage' between the parties of the same sex was unthinkable and by definition impossible." 486 F.Supp. at 1123.

We hold, therefore, that two persons of the same sex cannot validly contract a common law marriage.

In light of our holding in this case, the court does not feel compelled to delve into and discuss the testimony given by plaintiff and plaintiff's witness during the November 18, 1981 hearing.

Wherefore, we enter the following

## DECREE

And now, this February 17, 1982, after consideration of the petition filed by plaintiff pursuant to section 206, 23 P.S. of the Divorce Code of 1980, testimony adduced by the parties, and brief of plaintiff, it is hereby declared:

That the marriage alleged to exist between plaintiff, John DeSanto and defendant, William Barnsley, does not, has not, and can not exist, and such alleged marriage is illegal, void and nullity and of no effect, and

That, since a marital status does not exist between the parties, plaintiff's complaint in divorce is dismissed.

DeFURIA, *J.*, September 2, 1982—On or about February 17, 1982, an opinion was filed in this case in which we held that two persons of the same sex

cannot validly contract a common law marriage. In view of the court's holding, we did not address the testimony given by plaintiff and his witnesses during the November 18, 1981 hearing on the petition to determine marital status.

On or about June 7, 1982, appellant filed a petition for remand. Thereafter, on or about July 9, 1982, by per curiam order, the petition for remand was granted and the lower court was directed to prepare an expanded opinion on the merits of the case. Hence, this opinion.

Pennsylvania, unlike most other jurisdictions, recognizes a common law marriage.

"The law of Pennsylvania recognizes common law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be tolerated, not encouraged; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife . . . "

Baker v. Mitchell, 143 Pa. Super. 50, 17 A.2d 738 (1940); Commonwealth ex rel. McDermott v. McDermott, 236 Pa. Super. 541, 345 A.2d 914 (1975).

The Supreme Court of Pennsylvania, in Commonwealth v. Sullivan, 398 A.2d 978, 484 Pa. 130 (1979) stated:

"A common-law marriage may be created by uttering words in the present tense with the intent to establish a marital relationship."

In that case, appellant alleged that C. Goodpasture should not have been permitted to testify against him because she was his common-law wife. Appellant claimed that he and Goodpasture created a common-law marriage by agreeing to enter into a marital relationship. Appel-

lant attempted to support his position by showing that he and Goodpasture cohabited and were reputed to be husband and wife. The court went on to say that cohabitation and reputation cannot establish a marriage if the requisite contract was not entered into. Commonwealth v. Sullivan, supra at p.980 (1979).

We now turn to the testimony presented in this case. Appellant was the first witness to testify during the November 18, 1981 hearing. Appellant testified that on June 14, 1970, Paul Hill a/k/a Twiggy, a friend of his, suggested that the parties should have a wedding ceremony. However, this testimony must be viewed in light of appellant's other statements that the idea of the ceremony was both plaintiff's and defendant's. Appellant testified that Twiggy performed the ceremony and the parties exchanged rings and wedding vows. However, appellant could not recall the exact words said.

Additionally, DeSanto stated that he and Barnsley celebrated anniversaries. Appellant introduced into evidence two cards given by appellee to appellant. But, handwritten inside one of the cards can be found:

"Sorry about the wife business but this is the only card I could find . . . Love—Bill."

When asked by his counsel how the situation began that caused the parties to have an alleged marriage ceremony, appellant responded:

"Well, when I met Bill we talked and we talked for a whole hour and I was at his apartment because he had called me the year before. He had met me and he called me back when he moved to Yeadon, Pennsylvania, which is where I lived. I stayed overnight with him, and all of the sudden we had a ceremony because we had friends. We had Twiggy who is known as Paul Hill, who had a friend called Teddy

who was also a witness. It came about when Bill and I decided to go through with it because we wanted to be considered married.

With respect to household chores, appellant testified that he performed many of the household chores, laundry, shopping, cooking, cleaning, etc. and that appellee paid the bills.

Appellant's position is that many friends felt the parties were married: David DePaul, Jeff Finklestein, Joe Quillo, and Alex Contino, in addition to the next-door neighbors, real estate salesperson, bank officer, etc. However, not one of the above-mentioned persons, except for Alexander Contino, appeared in court on November 18, 1981, to testify on behalf of DeSanto.

Appellant's second witness, Paul Hill, testified about the alleged ceremony as follows:

Q. Do you recall a time in 1970 when John asked you to perform a ceremony for him?

A. Would you repeat the question, please?

Q. Do you recall a time in 1970 when John asked you to perform a ceremony for him?

A. Not specifically.

Q. Do you recall going over to John's apartment in the early evening and performing a ceremony between Mr. DeSanto and Mr. Barnsley?

A. Vaguely, very vaguely.

Q. Do you recall the words that were exchanged in that ceremony?

A. No, I don't.

Q. What do you recall of that ceremony?

A. I remember that they were at a party. Well, it was like a party for another friend of John's and me to meet Bill and that was all. It was just a small party.

Q. And was there any kind of a ceremony at that party?

A. It's possible. I don't — it's been a long time. I don't remember much about it.

Q. Mr. Hill, do you recall taking the hands of each of the two of them and saying, "I now pronounce you man and wife"?

A. It's possible but I couldn't, you know, I don't specifically recall.

Q. Have you ever performed such a ceremony for any other couple?

A. No.

Q. You have never been requested to?

A. Not to my memory.

Q. Do you think that it would be easy to forget that you performed a wedding ceremony?

A. No. I don't.

Q. But you can't remember whether you did or not?

A. No, I don't. I don't recall it. It's been a long time. I have been to a lot of parties since then and I don't remember.

Moreover, the witness stated that he had been drinking that evening.

Appellant next called Alexander Contino. Mr. Contino testified that he has known Barnsley since he was eight years old, that he was aware that from June, 1969 until December 1980 the parties were living together, that he was never told about a wedding ceremony nor did he attend a wedding ceremony between the parties.

The court believes that the parties to this action dated and/or lived together for 10 or so years. However, as noted previously, cohabitation is not sufficient to establish a common law marriage if the requisite contract was not entered into. A valid common law marriage requires clear and convincing proof of a contract de verbis praesenti. In Re Ross, Estate of, 38 Fay. L.J. 32 (1975).

"It is an elementary principle that in considering the credibility of witnesses, their manner of testifying, their apparent candor, intelligence, personal interest and bias or lack of it, are to be considered in determining what weight shall be given to such testimony." Gaston Estate, 361 Pa. 105, 62 A.2d 904 (1949); Danovitz v. Portnoy, 399 Pa. 599, 161 A.2d 146 (1960).

This court finds that the testimony of appellant with respect to the alleged contract of marriage is not worthy of belief.

Furthermore, the testimony of Paul Hill and Alexander Contino corroborate the lack of intent on the part of both parties.

Consequently, we hold that John DeSanto has not met the burden of proof sufficient to establish a common law marriage, even if two persons of the same sex could establish a marriage relationship.

We still maintain that two persons of the same sex cannot contract a marriage, be it ceremonial, or common law.